No. 25-2012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

CITY OF COLUMBUS, *et al.*,
Plaintiffs-Appellants,

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the
United States Department of Health and Human Services, et al.*,
Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

**EMERGENCY MOTION FOR STAY PENDING APPEAL**

———————————

*Of Counsel:*

ROBERT F. FOSTER
  *Acting General Counsel*

ELIZABETH C. KELLEY
  *Acting Deputy General Counsel*

JOCELYN S. BEER
  *Acting Deputy Associate
  General Counsel for Litigation*

JILL BRADLEY
GARRETT F. MANNCHEN
  *Attorneys*

  *U.S. Department of Health and
  Human Services*

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY HAYES
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant
  Attorney General*

CHARLES W. SCARBOROUGH
MAXWELL A. BALDI
  *Attorneys, Appellate Staff
  Civil Division, Room 7513
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 532-0211*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

STATEMENT ..................................................................................... 4

    A.    Statutory Background ........................................................4

    B.    Factual Background and Prior Proceedings ...................7

ARGUMENT ....................................................................................11

I.    By forcing issuers to alter their Exchange plans weeks before open enrollment starts, the district court's order injects chaos into the markets for individual health insurance plans..........................11

II.    The government is likely to succeed on the merits. .................................14

    A.    Plaintiffs lack standing to challenge the actuarial value policy.................................................................14

    B.    HHS lawfully expanded the permissible range for actuarial values. ................................................................18

CONCLUSION....................................................................................25

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Affordable Care Act established health insurance Exchanges, which allow millions of Americans to purchase individual coverage every year.  This litigation concerns a number of technical changes the Department of Health and Human Services made to the rules for consumers to access and for issuers to offer coverage through the Exchanges.  Plaintiffs challenged a slew of those changes, and the district court granted sweeping preliminary relief to prevent seven of them from going into effect.  As applied to one provision of the Final Rule, known as the actuarial value policy, the district court's order granting preliminary relief threatens to throw the Exchanges into chaos in the lead up to the annual open enrollment period, which begins on November 1.

Issuers offer plans on the Exchanges at various tiers, from bronze to platinum, reflecting an estimate of the average percentage of healthcare expenses the plan will cover.  This percentage is known as the plan's "actuarial value."  The ACA authorizes HHS to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan."  42 U.S.C. § 18022(d)(3).  Previously, the lower bound for variation was between 0% and 2% below the benchmark plan for each tier.  In the

Final Rule, HHS allowed all plans to vary by as much as 4% below the benchmark. The district court held that this decision was likely unlawful and stayed the effective date of the actuarial value policy.

This seemingly technical dispute threatens cataclysmic effects for the Exchanges. Before any plan can be made available on an Exchange, HHS (or a state agency responsible for its own Exchange) must certify that the plan offers an acceptable actuarial value. Thus, because of the district court's last-minute grant of preliminary relief, issuers will need to rewrite hundreds of plans in just a few weeks. HHS estimates that 80% of issuers participating in federally facilitated exchanges will need to revise their plans. HHS and state agencies then will need to review and approve those revised plans and other related paperwork and update systems with this data before open enrollment commences on November 1. If issuers cannot comply or if their plans cannot be approved, consumers will have fewer insurance options. This sudden destabilization of the Exchanges could have a devastating effect on individual consumers.

To prevent destabilization of the Exchanges, this Court should stay paragraph 2(f) of the district court's order, which prevents implementation of the actuarial value policy. Otherwise, the district court's order will cause

2

irreparable harm to the government and to millions of consumers.  Granting a stay would allow litigation to play out without disturbing the range of plans available in 2026.  And, if this Court ultimately concludes that the wider range of variation is unlawful, issuers can revert to the narrower range for 2027 in an orderly manner.

The government is also likely to succeed on the merits.  Plaintiffs have not established their standing to challenge the actuarial value policy.  HHS plainly has the authority to consider factors like encouraging issuer participation when it determines the de minimis range.  And HHS weighed the evidence, considered competing priorities, and explained its predictive policy judgment in the final rule.

To ensure enough time for HHS to provide guidance to issuers and States about the actuarial value policy in advance of open enrollment, the government respectfully requests that the Court resolve this motion **by September 5**.  The government does not seek an administrative stay because temporarily reverting to the wider range before snapping back to the narrower one would be even more destabilizing on the insurance market.

Plaintiffs oppose a stay pending appeal and intend to file a response.[1]

## STATEMENT

### A.    Statutory Background

1.  Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015).  Among its many provisions, the ACA provides for the creation of "Exchanges," which are State-specific marketplaces where consumers can compare and purchase private health insurance.  42 U.S.C. § 18031(d).  Some exchanges are operated by individual States.  *Id.* § 18041(b).  Other exchanges are operated by the federal government within the States.  *Id.* § 18041(c)(1).  In each State, individuals typically can enroll in health insurance plans through the state Exchange for the upcoming plan year during an annual "open enrollment period," or for the current plan year during "special enrollment periods" that become available if a certain "triggering event" occurs (*e.g.*, a person loses employer-based coverage).  *Id.* § 18031(c)(6).

---

[1] Pursuant to Fed. R. App. P. 8(a)(1)(A), the government has moved for a stay pending appeal in the district court.  Add.23.  Given the imminent open enrollment period, the government is simultaneously filing this motion and will notify this Court when the district court acts on the motion.

Under the ACA, most health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. §§ 18021(a)(1)(B), 18022(a). Exchange plans are categorized into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage"; "gold plans," for instance, must have an actuarial value of 80 percent, meaning the plan is designed such that the issuer will pay, on average, 80 percent of covered medical expenses, and the enrollee will pay the remaining 20 percent of expenses through out-of-pocket spending. *Id.* § 18022(d). Generally, higher actuarial value comes with higher premiums.

Actuarial values are calculated under regulations issued by HHS. *See* 42 U.S.C. § 18022(d)(2). The statute also instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). HHS initially allowed all plans to vary from the benchmark by up to 2% in either direction. 78 Fed. Reg. 12,834, 12,868 (Feb. 13, 2013). In 2016, HHS allowed certain bronze plans to vary by between 5% above or 2% below the benchmark. 81 Fed. Reg. 94,058, 94,181 (Dec. 22, 2016). In 2017, HHS expanded the range to allow most plans

5

to deviate by 2% above or 4% below the benchmark, and expanded bronze plans to deviate by 5% above or 4% below the benchmark. 82 Fed. Reg. 18,368, 18,382 (Apr. 18, 2017). It made this change to "provid[e] issuers increased [actuarial value] flexibility to improve the health and competitiveness of the markets." *Id.* at 18,369. Finally, starting in 2023, HHS again narrowed the de minimis range for most plans. 87 Fed. Reg. 27,208 (May 6, 2022). For most plans the range was set to 2% above or below the benchmark; some bronze plans were allowed to vary by between 5% above or 2% below the benchmark; and some silver plans were allowed to vary only by up to 2% above the benchmark. *Id.* at 27,391. The agency made this change because it believed it would allow consumers to more meaningfully compare plans in different tiers. *Id.* at 27,306-07. None of these prior changes were challenged in court.

2. To help make insurance more affordable, the ACA provides subsidies to eligible Exchange enrollees in the form of premium tax credits, which enrollees can claim on their annual federal income tax returns. *See* 26 U.S.C. § 36B. The subsidy caps the amount that a consumer would have to pay for a benchmark plan—*i.e.*, the second-lowest cost silver plan in the enrollee's Exchange—as a percentage of the consumer's annual household

6

income.  *See id.*  These tax credits may also be received in advance.  *See*
42 U.S.C. § 18082.

###    B.    Factual Background and Prior Proceedings

1.  On March 19, 2025, HHS proposed a series of regulatory changes to
the way Exchanges operate.  90 Fed. Reg. 12,942 (Mar. 19, 2025).  One of the
proposals was to expand the permissible range of variation for plans'
actuarial values.  HHS proposed allowing all standard tiers of plans to vary
up to 4% below their benchmarks.  *Id.* at 12,995-97.

HHS proposed this expanded range because, since the last change in
2023, the agency had "received considerable feedback from issuers that
indicates narrower de minimis ranges substantially reduce issuer flexibility
in establishing plan cost sharing."  90 Fed. Reg. at 12,996.  While HHS
acknowledged that plans under the narrower range were easier to compare,
issuers were prohibited from designing plans to provide for optimal cost
sharing.  *Id.*  The agency further noted that "issuers have also voiced concern
about their ability to continue to participate in the market generally," and
explained that "[s]ustained, robust issuer participation in the market is key
to ensuring overall market stability and keeping costs down."  *Id.*  Under the
expanded range, issuers could choose between issuing plans with higher

7

actuarial values to "attract enrollment" and plans with lower actuarial values to "appeal to wide segments of the population." *Id.*

HHS also acknowledged that expanding the de minimis range would likely cause premium tax credits to decline because they are calculated using a benchmark silver-level plan. 90 Fed. Reg. at 12,996-97. HHS noted that the change could diminish affordability for subsidized consumers, at least in the short term. *Id.* But it also projected that the change would increase affordability for unsubsidized consumers, which in turn would attract this group to expand the risk pool and reduce premiums as a whole. *Id.* at 12,997. HHS thus proposed to reject "a short-sighted approach to regulating the [actuarial value] de minimis ranges" in favor of ensuring that in the long-term "a sufficient choice of affordable plans" remains available. *Id.*

After considering more than 26,000 comments on the proposed rule, HHS finalized the actuarial value policy as proposed. 90 Fed. Reg. 27,074, 27,076, 27,176 (June 25, 2025). HHS reiterated that reverting to the wider de minimis range "will significantly improve issuer flexibility in plan design." *Id.* at 27,176. The agency projected three primary benefits from this increased flexibility. First, "these expanded ranges allow issuers to design plans that better promote competition in the market" by offering plans more

responsive to consumer needs. *Id.* Second, "the wider ranges provide flexibility for issuers to make adjustments to their plans within the same metal level," resulting in "greater continuity for consumers." Third, the "expanded ranges help maintain robust issuer participation" by "reducing compliance burdens." *Id.* The agency noted that this third goal was "particularly important considering that several issuers have publicly announced their intent to end participation in the Exchange in [Plan Year] 2026." *Id.*

HHS acknowledged that the new actuarial value policy could reduce the amount of tax credits available to subsidized consumers because they are calculated using a benchmark silver plan. 90 Fed. Reg. at 27,076. But, pointing to its rationale in the notice of proposed rulemaking, the agency explained that it was choosing to prioritize "access and affordability in the long term." *Id.* HHS determined that "this change will better incentivize unsubsidized enrollees to enroll in coverage, which [it] expect[s] to lower overall costs and further drive down premiums as the risk pool improves." *Id.* at 27,177.

2. Plaintiffs—three municipalities; Main Street Alliance, a group representing small business owners; and Doctors for America, a group of

9

physicians—sued and sought preliminary relief against nine provisions in the rule. Under § 705 of the Administrative Procedure Act, the district court stayed the effective date of seven of those provisions including the actuarial value policy. Add.25-26.

The district court first concluded that at least the municipalities and Main Street Alliance had standing to sue. Add.39-52. As relevant here, the district court then concluded that the actuarial value policy was likely arbitrary and capricious for two reasons. Add.63-67. First, the district court concluded that HHS relied on factors other than those Congress had intended because HHS did not justify the de minimis range it selected based solely on "uncertainties in differences in actuarial estimates." Add.65 (quotation marks omitted). Second, the district court held that the agency's reasoning for why the actuarial value policy would have long-term benefits was "conclusory and unsupported by evidence. Add.66. Specifically, the district court faulted the agency for referring to a "short-term trade off" without "data to back up the claim and reasoning that coverage would become 'more affordable' over time." Add.66.

The district court then concluded that the balance of the equities favored plaintiffs, relying primarily on the "strong public interest in

10

Americans maintaining affordable healthcare coverage."  Add.99.

Accordingly, the district court universally stayed the effective date of the

actuarial value policy.  Add.99; *see also* Add.26 ¶ 2(f) (staying implementation

date of "changes to the de minimis ranges for actuarial value calculations").[2]

## ARGUMENT

The government is entitled to a stay because it is likely to succeed on

the merits, it will suffer irreparable harm absent a stay, and the balance of

the equities and the public interest favor a stay.  *See Nken v. Holder*,

556 U.S. 418, 426 (2009).

**I.     By forcing issuers to alter their Exchange plans weeks
         before open enrollment starts, the district court's order
         injects chaos into the markets for individual health
         insurance plans.**

If the district court's order remains in full effect, 80% of issuers

participating in federally facilitated Exchanges will need to revise their plans

to come into compliance with the narrower de minimis range.  Add.8.  For

these federal Exchanges, 99.6% of consumers would be affected.  Add.8.

HHS understands that there is a problem of a similar scale for at least some

---

[2] The district court issued an initial order on August 22, Add.27-28, and
subsequently issued a corrected order on August 25, Add.25-26.  The August
25 order is the operative stay order.

State-run Exchanges, but the agency does not have ready access to data for those Exchanges.[3]  *See* Add.8.

Open enrollment begins on November 1.  HHS believes that issuers must be given at least one month to revise their plans, although this timeline would be "more aggressive" than any the agency has ever required for so extensive a plan design change.  Add.7.  In that time, issuers would need to redo their plan rates, filings, and forms needed to allow them to offer plans on the Exchanges.  Add.7.  Then HHS (and the relevant state agency) would need to review and approve these changes.  Add.6-7.  Ordinarily, approving plans involves an iterative process lasting "about six months."  Add.4.  To be ready for open enrollment, HHS believes it must receive proposals to bring plans into compliance with the smaller de minimis range by October 1.  Add.7.  Thus, HHS must provide guidance to issuers and States by September 5.  *See* Add.7.

This truncated window for altering their plans leaves issuers with a choice between two bad options.  Some issuers likely will try to redo their

---

[3] Some States that operate their own Exchanges have sought a similar stay of the effective date of the actuarial value policy in parallel litigation. *See* Mot. for PI and Stay, *California v. Kennedy*, No. 1:25-cv-12019 (D. Mass. filed July 18, 2025).

plans and revise their forms at unprecedented speed. Add.7. If those issuers manage to submit accurate and fully compliant plans in time to be approved, then the plans will be available on Exchanges. Add.7. But if the short timeline results in issuers making errors, their plans cannot be approved and will not be available. Add.7, 9. And if HHS errs in approving a plan, it must go through a complicated process to correct its mistake and to offer enrollees the option to switch to another plan, which is likely to lead to consumer confusion and risk disruptions to medical care. Add.9-10.

Alternatively, HHS predicts that some issuers will withdraw from the market rather than go through the rate-setting and approval process for a second time for the upcoming plan year on a drastically shortened timeline. Add.8-9. HHS warns that "there is a risk of having counties in States without any plans at all, or counties in States with an insufficient number of plans." Add.8. And if some counties have too few plans for a market to be competitive, they are "likely to experience higher premiums in future plan years." Add.9.

Either way, consumers face significant and irreparable harms. And the government and the public alike have a strong interest in preventing them from occurring. The risk that some counties may be left without plans

13

at all, Add.8, far outweighs the possibility that some consumers may face
higher costs for a year.  The government disagrees with the district court's
decision to preliminarily halt a range of provisions in the Final Rule, but it
has sought emergency relief only as to the actuarial value policy, because of
the risk of catastrophic consequences for the health insurance market.

## II.   The government is likely to succeed on the merits.

### A.   Plaintiffs lack standing to challenge the actuarial value policy.

To establish Article III standing, a plaintiff must have suffered an
injury in fact that is fairly traceable to the defendant's conduct and likely to
be redressed by a favorable decision.  *TransUnion LLC v. Ramirez*, 594 U.S.
413, 423 (2021).  A plaintiff must meet this requirement for each claim and
each form of relief he seeks.  *Id.* at 431.  At the preliminary injunction stage,
he must "make a 'clear showing'" that he is "'likely' to establish each element
of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).  None of the
plaintiffs have established standing to challenge the actuarial value policy.

1. The municipal plaintiffs assert standing based on their assertion
that the Final Rule will cause their residents to lose coverage, which in turn
will result in the municipalities' "shouldering the expense of uncompensated

14

care." Add.51-52. There are at least two major problems with this theory of standing.

First, it relies on a chain of speculation. It assumes that the actuarial value policy will increase net premiums for at least some consumers; that these consumers will choose to drop coverage rather than enroll in a less expensive plans; that these consumers will require medical care in Chicago, Columbus, or Baltimore; that they will obtain emergency medical transportation or care from the city; and that they will not pay for that care. A party lacks standing when "an independent third part[y] … st[ands] between the plaintiff and the challenged actions." *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 235 (4th Cir. 2005). Here, every link in the causal chain depends on the actions of independent third parties. Nor have the municipalities established that this increased burden on their fiscs is inevitable. As the Supreme Court has explained, a plaintiff fails to satisfy the "causation requirement" for standing if a challenged government action is "too speculative" and too "far removed from its distant (even if predictable) ripple effects." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Here there are many alternative paths for consumers to take that do not end with an uncompensated ride in a Columbus ambulance.

15

Second, the municipalities rely on self-inflicted injuries. Plaintiffs may not rely on the incidental effects of policies to establish standing. If the cities choose to provide services to their residents, they cannot complain that federal policy causes more residents to seek those services. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 662–64 (1976) (per curiam). A local government's desire to "supply social services such as healthcare," *United States v. Texas*, 599 U.S. 670, 674 (2023), is not a cognizable injury.

2. Main Street Alliance invokes associational standing, which requires it to establish that at least one member could sue in her own right. *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). Main Street Alliance points to a single member, Brooke Legler, who asserts that she relies on insurance purchased through an Exchange to pay for expensive medicines. Add.115. Legler further asserts that she runs a small business "on narrow margins," predicts that the Final Rule "will cause [her] health insurance costs to increase to a level that [she] cannot afford," and surmises that these increased costs "will likely make it impossible for [her] to continue [her] business." Add.116. These allegations do not establish that the actuarial value policy causes Legler certainly impending harm.

16

Legler's assertion of standing rests on contingency and conjecture. While Legler notes that she currently receives premium subsidies, she does not allege that she will continue to receive those tax credits next year, after temporary expansion of the subsidy program expires. *See* 26 U.S.C. § 36B(b)(3)(a)(i), (iii). If Legler will be unsubsidized next year, then she has no basis to complain about the actuarial value policy's effect on affordability. In fact, the policy is projected to lower premium costs for unsubsidized consumers. *See* 90 Fed. Reg. at 27,176; *see also* Add.130 (plaintiffs' expert acknowledges that the policy will "lower gross premiums"). And even if Legler does receive subsidies next year, she still has not offered any details to show that her net costs will be higher. *See* Add.124 n.17 (plaintiffs' expert asserts only that "many" subsidized consumers will face higher net premiums). Indeed, the record contains no information about what tier of plan she currently purchases, which issuer issues that plan, whether her issuer intends to take advantage of the expanded de minimis range, and whether other issuers will offer comparably priced plans. Legler fails to "make a 'clear showing,'" *Murthy*, 603 U.S. at 58, that she will face higher costs, much less her forecasted loss of her business.

17

3.  Doctors for America offers an even more attenuated theory of standing.  This organization submitted declarations from two physician members, neither of whom asserts any cognizable injuries to themselves.  *See* Add.106-07, 111-12.  They mostly rely on asserted injuries to their patients, but they cannot raise claims on behalf of third parties.  *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013).  Neither physician directly asserts a personal loss of income as a result of the rule, much less as a result of the actuarial value policy.  Finally, while one of the physicians asserts that he will need to spend more time counseling his patients about paying for care, *see* Add.107, the Supreme Court has rejected such a diversion of resources as a basis for asserting standing, *see Alliance*, 602 U.S. at 395.

**B.    HHS lawfully expanded the permissible range for actuarial values.**

1.  Arbitrary and capricious review "is highly deferential, with a presumption in favor of finding the agency action valid." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quotation marks omitted).  This is especially true when an agency's decision involves "not just simple findings of fact but complex predictions based on special expertise"—in those cases, "a reviewing court must generally be at its most deferential." *Id.* (quotation marks omitted).  The court's job is to

18

determine "whether the agency considered the relevant factors and whether a clear error of judgment was made," without "substitut[ing] its judgment for that of the agency." *Id.* (quotation marks omitted).  HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary or capricious.

The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3).  In accounting for "differences in actuarial estimates," HHS must consider differences in cost-sharing and other components between plans.  The statutory language calls for the agency to exercise discretion in how much variation to permit.  The phrase "de minimis" implies some play in the joints.  *Cf. Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances ….").  Congress did not, for example, demand that HHS select the "maximum feasible" standard, *cf.* 49 U.S.C. § 33902(a).  Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range,

*see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024), and HHS must make policy judgments in carrying out that duty.

HHS reasonably exercised its discretion here.  HHS explained that it sought to "significantly improve issuer flexibility in plan design."  90 Fed. Reg. at 27,176.  The agency predicted that this increase in flexibility would have three key benefits.  It would "promote competition" by allowing issuers to be more responsive to consumer needs, allow "greater continuity for consumers," and encourage issuers to continue participating in the Exchanges.  *Id.*  The agency therefore provided a reasoned explanation for its decision to alter the actuarial value policy.

HHS also acknowledged that its decision involved trade-offs.  Expanding the de minimis range, HHS acknowledged, would likely reduce tax credits for subsidized consumers.  90 Fed. Reg. at 27,076.  But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers.  *See id.*  HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable.  *See id.*; *see also id.* at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing

20

"short-sighted approach" of focusing only on maximizing subsidies).  HHS
did not act unreasonably in making that policy choice.

2.  The district court construed HHS's authority under 42 U.S.C.
§ 18022(d)(3) too narrowly. That provision instructs HHS to "develop
guidelines to provide for a de minimis variation in the actuarial valuations
used in determining the level of coverage of a plan to account for differences
in actuarial estimates."  The district court read that provision to permit the
agency to consider *only* "differences in actuarial estimates."  *See* Add.65.  By
that logic, HHS would faithfully implement the statute by selecting the
narrowest technically feasible range regardless of the consequences.  Thus, if
HHS concluded that issuers should be able to project their actuarial values
within 0.01% of a benchmark plan, it would be required to set that range—
even if most issuers fled the Exchanges because of the overly restrictive
policy.  But if HHS actually tried to implement such a policy and steadfastly
refused to consider the resulting loss of coverage, a reviewing court would
likely conclude that the agency failed to consider an important aspect of the
problem. *Cf. Michigan v. EPA*, 576 U.S. 743, 759 (2015) (holding
unreasonable agency's failure to consider costs of regulation).  It follows,
therefore, that HHS has authority (and indeed an obligation) to consider

21

more than just the technical limits of actuarial analysis when it sets the de minimis range.

The agency has consistently understood its statutory obligation in this more holistic light. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (consistency in agency interpretation bolsters its "power to persuade"). Indeed, every time that HHS has set or adjusted the de minimis range, it has looked to factors beyond "differences in actuarial estimates." When HHS set the range initially in 2013, it sought to "strik[e] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics," and sought to "allo[w] plans to retain the same plan design year to year." 78 Fed. Reg. at 12,851. When the agency subsequently adjusted the range, it based its reasoning on these factors, 87 Fed. Reg. at 27,307, as well as others such as market competitiveness, 82 Fed. Reg. at 18,369. As plaintiffs and the district court understand the statutory scheme, all of these decisions were unlawful. That is incorrect—indeed, none of those prior adjustments was ever challenged— and the district court erred in invalidating HHS's most recent adjustment to the actuarial range, which relied on many of the same considerations.

HHS must consider differences in actuarial estimates when it sets the de minimis range but, to fulfill its obligation to engage in reasoned decision making, it must also consider other important parts of the problem facing the agency. *See Michigan*, 576 at 750. Setting a permissible range for actuarial values is one element of ensuring access to affordable healthcare—a complex and multifaceted problem with various overlapping elements. Not only was HHS allowed to consider effects like the overall health of the risk pool and the insurance market when it established the de minimis range, it was required to consider those factors. And it properly discharged that obligation here.

3. In concluding that HHS lacked evidence for its conclusions, the district court misunderstood the record before the agency. *See* Add.66. The district court concluded that because widening the de minimis range will reduce subsidies, HHS lacked "data to back up the claim and reasoning that coverage would become 'more affordable' over time. Add.66.

First, the district court failed to consider that subsidized consumers will be able to buy less expensive plans. A decreased subsidy, therefore, does not necessarily imply that the consumer will be worse off. The ACA's tax credit system is designed to ensure that certain consumers can obtain

23

insurance and pay no more than a fixed portion of their income (between 0% and 8.5%) for a benchmark plan. For example, consider an individual who is entitled to pay no more than $3,000 per year in premiums. If this year he purchased the benchmark silver plan in his Exchange for $6,000, he would be entitled to a $3,000 tax credit and would effectively pay $3,000. And if, under the new actuarial value policy, his issuer charges only $5,000 in premiums for the same plan, he will get only a $2,000 tax credit but will still effectively pay $3,000. Consumers who choose to purchase more expensive plans may be slightly worse off in the short run, but they too will benefit in the long-term from a healthier, broader risk pool. Contrary to the assumption undergirding the district court's conclusion, it does not inexorably follow that when subsidies decrease, plans become less affordable.

Second, the district court erred by assuming that all consumers benefit from subsidies to purchase their plans. When a temporarily expanded subsidy expires at the end of this year, only some consumers will be eligible for tax credits. *See* 26 U.S.C. § 36B(b)(3)(a)(i), (iii). For unsubsidized consumers, it is true that they will have plans available to them with lower premiums. After all, the reason that subsidies will decline is that the premiums will decrease for the second-cheapest silver plans. HHS did not

24

face a choice between offering higher or lower subsidies in a vacuum, as the district court believed.  *See* Add.66 (suggesting change was based on "a new Administration's policy preference for less generous subsidies" (quotation marks omitted)).  Rather, HHS had to decide as a matter of policy whether higher subsidies were worth a smaller risk pool and higher premiums for everyone.  HHS expressly explained that it was choosing the long-term health of the risk pools over a short-term increase in subsidies for a portion of the population.  90 Fed. Reg. at 27,076.  The district court was not free to second guess that policy judgment.

## CONCLUSION

For the foregoing reasons, this Court should stay paragraph 2(f) of the district court's order pending the government's appeal.  Given the imminent open enrollment period, the government respectfully requests that the Court resolve this motion by September 5.

Respectfully submitted,

*Of Counsel:*

ROBERT F. FOSTER
  *Acting General Counsel*

ELIZABETH C. KELLEY
  *Acting Deputy General Counsel*

JOCELYN S. BEER
  *Acting Deputy Associate*
    *General Counsel for Litigation*

JILL BRADLEY
GARRETT F. MANNCHEN
  *Attorneys*

  *U.S. Department of Health and*
    *Human Services*

AUGUST 2025

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY HAYES
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant*
    *Attorney General*

CHARLES W. SCARBOROUGH

 /s/ *Maxwell A. Baldi*
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-0211*
  *maxwell.baldi@usdoj.gov*

26

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,194 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
MAXWELL A. BALDI