No. 25-2012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CITY OF COLUMBUS; MAYOR & CITY COUNCIL OF BALTIMORE; CITY
OF CHICAGO; DOCTORS FOR AMERICA; MAIN STREET ALLIANCE,

*Plaintiffs-Appellees,*

*v.*

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
UNITED STATES; UNITED STATES DEPARTMENT OF HEALTH & HUMAN
SERVICES; MEHMET OZ, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
CENTERS FOR MEDICARE AND MEDICAID SERVICES; CENTERS FOR MEDICARE
& MEDICAID SERVICES,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
District of Maryland at Baltimore

BRIEF OF AMERICA'S HEALTH INSURANCE PLANS, INC.
AS *AMICUS CURIAE* IN SUPPORT OF GRANTING THE
MOTION TO STAY PENDING APPEAL

Pratik A. Shah
Margaret O. Rusconi
AKIN GUMP STRAUSS
  HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
pshah@akingump.com

*Counsel for* Amicus Curiae *America's
Health Insurance Plans, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-2012__      Caption: __City of Columbus v. Kennedy__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__America's Health Insurance Plans, Inc.__
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       N/A


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                ☐YES ☑NO
      If yes, identify all such owners:
       N/A

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:
       N/A

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                      ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.
       N/A

7.    Is this a criminal case in which there was an organizational victim?       ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

       N/A

Signature: /s/ Pratik A. Shah _____       Date: _____9/5/2025_____

Counsel for: Amicus Curiae _____

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF *AMICUS CURIAE* .............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ......................................................................................................4

    I.    PREPARING QUALIFIED HEALTH INSURANCE PLANS FOR THE MARKETPLACE IS A LONG AND CONSIDERED PROCESS.................................................................................................4

    II.    GIVEN THE TIMING, THE DISTRICT COURT'S ORDER WILL CAUSE IMMEDIATE, SERIOUS, AND IRREPARABLE HARM TO PLAN ISSUERS AND CONSUMERS.................................................................................................8

CONCLUSION ................................................................................................10

CERTIFICATE OF COMPLIANCE .................................................................12

i

# TABLE OF AUTHORITIES

**S̲tatutes:**

42 U.S.C.
§ 18022(d)(3) ......................................................................5, 6
§ 18031(d)(2)(B) ....................................................................4

Health Care and Education Reconciliation Act of 2010, Pub. L. No.
111-152, 124 Stat. 1029 ........................................................1

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124
Stat. 119 (2010) ....................................................................1

**O̲ther A̲uthorities:**

45 C.F.R.
§ 154.215(h) ..........................................................................7
§ 156.20 .................................................................................5

Fed. R. App. P. 29(a)(4)(E) .............................................................1

Centers for Medicare & Medicaid Services, *A quick guide to the
Health Insurance Marketplace®: When can you get health
insurance?* (last visited Sept. 4, 2025) .................................7

Centers for Medicare & Medicaid Services, *Unified Rate Review
Instructions* (2024) ...............................................................6

F̲orsberg, V̲anessa C., C̲ong. R̲sch. S̲erv., R44065, H̲ealth
I̲nsurance E̲xchanges and Q̲ualified H̲ealth P̲lans:
O̲verview and P̲olicy U̲pdates (2025) ......................................4, 5

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance industry.  AHIP is committed to market-based solutions and public-private partnerships that make high-quality coverage and care more affordable, accessible, and equitable for everyone.  Along with its predecessors, AHIP has over 50 years of experience in the industry.  AHIP's members offer health and supplemental benefits through the individual insurance market, employer-provided coverage, and public programs such as Medicare and Medicaid.  This includes providing coverage made available on the Affordable Care Act (ACA)'s federally-facilitated and state-based exchanges.  Combined, AHIP's members provide health care coverage, services, and solutions to more than 200 million Americans.  That experience gives AHIP extensive first-hand knowledge about the Nation's healthcare and health insurance systems, and a unique understanding of how those systems work.

Health insurance issuers are among the entities most directly and extensively regulated by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act

---

[1] All parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amicus*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

of 2010, Pub. L. No. 111-152, 124 Stat. 1029. AHIP has participated as *amicus curiae* in other cases to explain the practical operation of ACA and its implementing rules.  *See, e.g., King v. Burwell,* No. 14-114 (U.S.).  Likewise here, AHIP seeks to provide the Court with its unique expertise and experience regarding the operation of health insurance markets, what is required to participate in those markets, and the consequences to issuers (and thus consumers) of the district court's decision to stay the effective date of Health and Human Services (HHS)'s actuarial value policy just two months before the annual open enrollment period begins.  AHIP's perspective will provide the Court with a fuller understanding of the serious and irreparable practical consequences of allowing that order to remain in effect pending appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The government has moved for limited interim relief—a stay pending appeal of just one subsection of one paragraph of the district court's order addressing just one provision of the challenged HHS rule.  AHIP, while taking no position on the underlying merits of the case, supports that relief and submits this brief to emphasize, from the perspective of health plan issuers, the substantial harm that will follow if that relief is denied.

Under ordinary circumstances, the development and regulatory approval of health insurance plans is a tightly choreographed process.  Issuers begin designing their plans twelve or more months before the current plan year—spending months gathering data and testing the different options before submitting their initial proposals to state and federal regulators.  Regulators then take time to review the proposals, asking for clarification and negotiating.  By the fall, plans are approved, giving issuers months to send renewal notices to members and educate consumers more broadly about the available plans before marketplace open enrollment begins on November 1.

The district court's order upends this process with open enrollment mere weeks away.  Specifically, as explained in the government's motion and below, paragraph 2(f) of the order changes the contours of a regulatory requirement critical to plan design.  Left in place, many issuers might have to redesign and resubmit their

plans—and do so within less than 30 days. Others may not be positioned to respond at all. In the end, the only certain result is massive uncertainty—leaving, in turn, an unstable market and confused consumers.

The Court should thus grant the government's motion for a stay pending appeal.

## ARGUMENT

## I. PREPARING QUALIFIED HEALTH INSURANCE PLANS FOR THE MARKETPLACE IS A LONG AND CONSIDERED PROCESS

The ACA authorized the creation of health insurance exchanges (also known as marketplaces) to help consumers and small business owners "shop for and purchase private health insurance coverage and, where applicable, be connected to public health insurance programs (e.g., Medicaid)." VANESSA C. FORSBERG, CONG. RSCH. SERV., R44065, HEALTH INSURANCE EXCHANGES AND QUALIFIED HEALTH PLANS: OVERVIEW AND POLICY UPDATES 1 (2025).[2] To be offered through an exchange, though, a health insurance plan must be certified as a "qualified health plan." 42 U.S.C. § 18031(d)(2)(B).

The certification process is carefully structured and time consuming. First, issuers must develop their proposed products and rates. That process takes several months and requires gathering data on claims, enrollment, demand, and market

---

[2] https://www.congress.gov/crs-product/R44065.

trends, as well as other factors including changes in provider reimbursement rates and the availability of new drugs and other treatments. Issuers also must analyze the anticipated risk pool in each market—assessing the anticipated increase in healthcare costs, how the age and health status of the risk pool might change, and how new state or federal regulations might affect costs or benefits. Issuers then use that information to design benefit structures and cost-sharing features that comply with federal and state regulatory requirements, as well as consumer demand.

A central design constraint is the target "actuarial value" (AV)—*i.e.*, the average percentage of healthcare costs a plan will cover (versus what enrollees pay out-of-pocket). *See* 45 C.F.R. § 156.20. Issuers must design deductibles, copays, coinsurance, out-of-pocket maximums, and the like so that, in the aggregate, the plan meets, within the allowable de minimis range, the designated AV threshold—90% for platinum plans, 80% for gold, 70% for silver, and 60% for bronze. *See* FORSBERG, *supra*, at 6. Over the course of the rate development period, issuers continually test and refine plan designs and rates to both ensure regulatory compliance and maximize competitiveness, all while staying within the HHS-authorized range of the applicable AV threshold. *See* 42 U.S.C. § 18022(d)(3) (authorizing HHS to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan").

5

Issuers next prepare the requisite regulatory filings—with initial qualified health plan applications due beginning in early spring of the year preceding the plan year (e.g., March 2025 for 2026 plans), depending on state regulators' timelines. Issuers must fill out the Unified Rate Review Template, which provides a detailed breakdown of the proposed rate—including historical and projected claims data; assumptions of medical trends and administrative costs; and the actuarial justification for the proposed rates. Issuers also must provide an actuarial memorandum prepared and certified by a qualified actuary that explains the methodologies, data sources, and assumptions used to develop the rates, and a consumer justification narrative that explains to consumers the reasons for the proposed rates. *See* Centers for Medicare & Medicaid Services, *Unified Rate Review Instructions*, at 4 (2024).[3] Some states may require additional documentation or different filing formats. *See also generally id.* (noting some states have different requirements).

Once issuers submit the filings, state and federal regulators review them, checking for completeness, accuracy, and adherence to state and federal law. Regulators may ask the issuer for more data or clarification on the assumptions used, and may negotiate with the issuer to adjust proposed rates. Proposed rates are typically posted online, and the public is given a window to submit comments for

---

[3] https://www.cms.gov/files/document/unified-rate-review-instructions.pdf.

6

regulators to consider. *See* 45 C.F.R. § 154.215(h). Regulators then approve, modify, or disapprove the proposed plans and rates.

If the plans and rates are approved, the issuer finalizes consumer-facing plan documents, such as handbooks and required consumer materials. Renewal notices are also finalized and mailed, or otherwise communicated to enrollees. The issuer then begins marketing the approved plans for the open enrollment period, which typically starts on November 1st of the year preceding the plan year (November 1, 2025 for 2026 plans). Consumers have from November 1 until January 15 to shop for and enroll in a plan. *See* Centers for Medicare & Medicaid Services, *A quick guide to the Health Insurance Marketplace®: When can you get health insurance?*.[4]

In total, the entire process can take a full year for many issuers, with the rate development process beginning 10-12 months before plans are approved.

---

[4] https://www.healthcare.gov/quick-guide/dates-and-deadlines/ (last visited Sept. 4, 2025).



## II. GIVEN THE TIMING, THE DISTRICT COURT'S ORDER WILL CAUSE IMMEDIATE, SERIOUS, AND IRREPARABLE HARM TO PLAN ISSUERS AND CONSUMERS

Left in place pending the government's appeal, the district court's order will throw this year's plan certification process into disarray. Paragraph 2(d) of the order effectively changes the rules for determining and meeting the applicable AV threshold—a significant component of plan design—and does so just two months before open enrollment begins.

That eleventh-hour change creates profound uncertainty. To comply with the narrower AV ranges required as a result of the district court's order, many issuers will have to completely redesign affected plans that were otherwise designed and submitted in good faith to align with the AV ranges previously permitted under

8

HHS's rule. To do so, plans must engage in a complex process of calibrating benefits, cost-sharing—including deductibles and maximum-out-of-pocket amounts (MOOPs)—and rates.

The complexity of that task is compounded by the fact that some provisions of the HHS rule that are essential to plan design have been allowed to go into effect, while others (e.g., the AV policy) have been stayed. For example, the provision related to the revised premium adjustment percentage methodology, which results in a higher MOOP, was allowed to go into effect. But issuers are unlikely to have plan designs readily available that incorporate both the higher MOOP that results from the rule and the narrower AV ranges that result from the district court's order.

It would be under these never-before-seen circumstances that plans would need to undertake revising plan designs and rates, preparing new rate filing documents, and undergoing another round of regulatory review—a process that normally takes up to a year—all in just 30 days. *See* Emergency Mot., Add. 7, ¶ 20 (CMS "can accept changes in plan design, cost sharing, rates and benefits data until around October 1 in order to be able to ingest this data, perform some superficial quality control, and display it in time for November 1.").

As a result, issuers will face increased administrative costs and significant logistical obstacles. Some issuers may be unable to meet various state deadlines, such as those to send member renewal notices, which must include plan and rate

9

information, potentially leading to fewer plans available to consumers. Meanwhile, many issuers have already begun the process of printing and mailing renewal notices or other enrollee communications and will have to send revised versions, which is likely to result in consumer confusion. And still, other issuers may not be positioned to respond on this new timeline at all.

Moreover, not every issuer is situated equally, or equally able to redesign and resubmit an application with the speed the district court's order requires. That will have consequences on the market more broadly, potentially leaving consumers with fewer plan options or plans that may not be as well suited to their needs.

At bottom, without a stay, paragraph 2(f) of the district court's order will upend a lengthy process already near completion—sowing chaos into a system built on stability.

## CONCLUSION

The Court should grant the motion for a stay pending appeal.

Dated:  September 5, 2025

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
Margaret O. Rusconi
AKIN GUMP STRAUSS
   HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
pshah@akingump.com


*Counsel for* Amicus Curiae *America's Health Insurance Plans, Inc.*

11

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) because it contains 1,886 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft 365, 14-point Times New Roman font.

*/s/ Pratik A. Shah*
Pratik A. Shah

September 5, 2025