No. 25-2012

IN THE

# United States Court of Appeals for the Fourth Circuit

CITY OF COLUMBUS, *et al.*,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services, et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 1:25-cv-02114

**RESPONSE IN OPPOSITION TO MOTION
FOR STAY PENDING APPEAL**

Joel McElvain
Cortney Robinson
Christine L. Coogle
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT .......................................................................................4

ARGUMENT .....................................................................................10

I. Defendants Are Unlikely to Prevail on the Merits............................10

    A.    Plaintiffs Have Standing to Challenge the Actuarial
          Value Policy.................................................................11

    B.    The Actuarial Value Policy Is Likely Arbitrary and
          Capricious .................................................................14

II. Defendants Face No Irreparable Harm from the District
    Court's Order, but Plaintiffs and the Public Will Be
    Irreparably Harmed by a Stay ..........................................................20

CONCLUSION..................................................................................26

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ..............................23

*Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025) ....................14

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .....................13, 14

*Hilton v. Braunskill*, 481 U.S. 770 (1987).................................................10

*King v. Burwell*, 576 U.S. 473 (2015) ................................................5, 6, 7

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ............5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ......................4

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................10, 23, 25

*Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011)...............16

*Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260
   (4th Cir. 2018)...............................................................................15, 16

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)............................................11

*Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*,
   505 U.S. 214 (1992) ....................................................................16, 17

## Statutes

5 U.S.C. § 705................................................................................2, 9

26 U.S.C. § 36B ...............................................................................6

26 U.S.C. § 36B(b)(3)........................................................................6

42 U.S.C. § 18022(d)(1) ...............................................................6, 17

42 U.S.C. § 18022(d)(3) ..................................................... 1, 3, 6, 9, 14-15

42 U.S.C. § 18022(e) ................................................................................22

42 U.S.C. § 18031(b) ..................................................................................5

Pub. L. No. 111-148, 124 Stat. 119 (2010) ...............................................4

Pub. L. No. 111-152, 124 Stat. 1029 (2010) .............................................4

Ohio Rev. Code Ann. § 4765.35(A) ..........................................................13

**Regulations**

45 C.F.R. § 156.80(d) ................................................................................22

45 C.F.R. § 156.201(b) ..............................................................................24

45 C.F.R. § 156.202(b) ..............................................................................24

**Other Authorities**

90 Fed. Reg. 4424 (Jan. 15, 2025) .............................................................7

90 Fed. Reg. 12,942 (Mar. 19, 2025).......................................................7, 8

90 Fed. Reg. 27,074 (June 25, 2025) ..........................8-9, 13, 16-18, 24-25

Centers for Medicare & Medicaid Servs., *Guidance on Hardship
Exemptions for Individuals Ineligible for Advance Payment of
the Premium Tax Credit or Cost-Sharing Reductions Due to
Income, and Streamlining Exemption Pathways to Coverage*
(Sept. 4, 2025) ........................................................................................22

Columbus, Ohio, City Code § 1934.01......................................................13

Cong. Res. Serv., *Health Insurance Exchanges and Qualified
Health Plans: Overview and Policy Updates* (May 6, 2025) .................7

State Health and Value Strategies, *New Guidance Expands Pool of Individuals Eligible to Purchase Catastrophic Plans* (Sept. 5, 2025) ........................................................................22

## INTRODUCTION

The Affordable Care Act extends a promise: all Americans are guaranteed access to insurance coverage that will pay for their health needs.  One way that the ACA fulfills that promise is by establishing health insurance Exchanges, through which individuals can shop for an affordable policy that covers a set of essential health benefits. Individuals shopping on the Exchange may choose among plans offering four statutorily-prescribed levels of generosity.  A "silver" plan, for example, covers 70% of a typical enrollee's expected health care costs, leaving 30% to be paid out of pocket by the enrollee.

The Act permits the Centers for Medicare & Medicaid Services (CMS) to "provide for a de minimis variation in the actuarial valuations" of these plans "to account for differences in actuarial estimates."  42 U.S.C. § 18022(d)(3).  In June 2025, while the rate filing season was already well underway for the upcoming 2026 plan year, the agency invoked this authority to permit insurers to market plans as "silver" that ranged as low as 66% in actuarial value.  This rule would have far more than a "de minimis" effect.  It would operate as a bait and switch for an enrollee who buys a silver plan expecting to get the full value promised

1

by the statute.  It also would make insurance more expensive across the board, because subsidies for ACA coverage turn on the cost of the cheapest silver plans in a given market.  By permitting insurers to market cheaper but less generous plans as silver plans, the rule would reduce subsidies for all Exchange plans, reducing federal payments by $1.2 billion in 2026 alone and raising net costs for a typical family by $714 for that year.

The district court properly stayed the effective date of that provision under 5 U.S.C. § 705.  Defendants do not identify any error in the district court's analysis, or any other reason that the provision should be put into effect.  The district court correctly found that Main Street Alliance (MSA) has standing because its named member relies on subsidized coverage to obtain treatment for a serious medical condition, and she would pay more for the same coverage if the rule were to go into effect.  The district court also correctly found that the municipal plaintiffs—the Cities of Columbus, Baltimore, and Chicago—would receive less compensation for the health services they provide for their residents if CMS were permitted to proceed with its rule.

On the merits, there is no relevant dispute among the parties as to the proper reading of Section 18022(d)(3): Defendants concede that CMS must consider "differences in actuarial estimates" when it sets the permissible de minimis ranges for plans' actuarial values. That should be the end of the matter, because the agency did not consider this statutory factor at all when it rushed in mid-year to issue its new rule. Moreover, CMS's reasoning in support of its rule fails even on its own terms. Although the agency asserted that the rule would lead to lower premiums in the long run, it failed to contend with, or even acknowledge, the substantial body of empirical research showing that a rule that lowers insurance subsidies by more than $1 billion per year would have precisely the opposite effect.

Although Defendants now profess worry that some insurers may find it difficult to revise their plan offerings, they far overstate the extent of this concern, and CMS's recent behavior shows that the agency itself does not share its litigators' fears. The vast majority of the plans that insurers intend to offer on the Exchanges would already comply with the actuarial valuation rules that were in place before June 2025. The small fraction of noncompliant plans can readily be adapted, as insurers would

have taken CMS's advice to plan ahead for changes in the legal landscape. One such change arose only this past Thursday, while Defendants' stay motion was already pending in this Court, when CMS issued a new policy, without warning, expanding eligibility for catastrophic coverage. This surprise announcement will similarly prompt insurers to seek to adjust their rates, whether or not the district court's order is stayed. CMS would not have adopted this eleventh-hour policy change if it were genuinely of the view that insurers could not timely respond to such developments. The balance of the equities thus weighs heavily in favor of keeping the district court's order in place to protect Plaintiffs and the public from devastating increases in their health care costs.

## STATEMENT

1. In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). Before the Act's reforms went into effect in 2014, individual health

insurance markets were "dysfunctional." Add.30. Insurers were free to deny coverage for people with pre-existing conditions, to refuse to renew such coverage, or even to revoke such coverage after it had been issued. Now, however, "the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020) (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)).

The Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 482 (quoting 42 U.S.C. § 18031(b)(1)). These Exchanges, also known as health insurance Marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. *King*, 576 U.S. at 479. Some states operate their own Exchanges, while CMS operates a federally facilitated Exchange in other states. Add.32.

Plans offered on the Exchanges offer various levels of generosity. A "bronze" plan provides benefits that are actuarially equivalent to 60% of the full value of benefits to the plan (meaning that premiums are calculated in the expectation that out-of-pocket spending would pay for 40% of costs), and "silver," "gold," and "platinum" plans offer benefits that

are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of the plan's benefits. 42 U.S.C. § 18022(d)(1). Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation … to account for differences in actuarial estimates." *Id*. § 18022(d)(3).

The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals." *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income, but are pegged to the cost of the benchmark silver plan, or the second-lowest-cost silver plan offered within a market. *See* 26 U.S.C. § 36B(b)(3)(B)–(C). There is no income cap for PTCs under current law, *see id*. § 36B(b)(3)(A)(iii), but a prior 400% income cap will be reinstated for 2026 absent further congressional action.

In sum, the Act requires that insurers offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. Add.120-121. Increasing enrollment in quality health insurance coverage is both the ACA's immediate goal and key to its long-term success. Insurance market stability requires robust enrollment, particularly by relatively healthy individuals. Add.121; *King*, 576 U.S.

6

at 480. Limiting the cost of health insurance is, in turn, essential to promoting enrollment. Add.121; *King*, 576 U.S. at 480–81.

2. CMS ordinarily announces its policies for the Exchanges through annual rulemakings, which are typically completed before insurers are required to submit their plan designs to state regulators. Cong. Res. Serv., *Health Insurance Exchanges and Qualified Health Plans: Overview and Policy Updates* 57-58 (May 6, 2025). In keeping with that practice, CMS published a final rule in early 2025 that addressed the operation of the Exchanges for the 2026 plan year. Supp.Add.28; *see* 90 Fed. Reg. 4424 (Jan. 15, 2025). That rule retained the agency's existing rules regarding permissible actuarial value ranges for plans on the Exchanges. Supp.Add.28. Insurers began to prepare their plan offerings against that regulatory background. *Id.*

In March 2025, while the rate filing season was already underway, CMS departed from its ordinary practice by initiating a second round of rulemaking. 90 Fed. Reg. 12,942 (Mar. 19, 2025); Supp.Add.28. As relevant here, the agency proposed to expand the permissible range of "de minimis" variations in actuarial values of plans on the Exchanges, so that, for example, bronze plans could range as high as 65% in actuarial

7

value and silver plans could range as low as 66% in actuarial value. 90 Fed. Reg. at 12,995-12,997.

That proposal was immediately controversial, both for its content and its timing. The National Association of Insurance Commissioners, for example, warned that the proposal "would compromise the integrity and health of the risk pool, discourage carrier participation, lead to higher premiums, and destabilize state insurance markets." Supp.Add.16. Issuers in many states had to submit their plan designs to state regulators while CMS's proposal remained pending. Supp.Add.28. Well-advised insurers would have made contingency plans to prepare for the possibility that the new actuarial value policy, if adopted, would not survive a legal challenge. Supp.Add.28-29.

CMS finalized its actuarial value policy, without relevant change, in late June 2025. 90 Fed. Reg. 27,074, 27,176 (June 25, 2025). By eroding the value of silver plan coverage, the final rule would also reduce PTCs for all subsidized enrollees on the Exchanges, as these credits are calculated on the basis of silver plan premiums. 26 U.S.C. § 36B(b)(3)(B). Federal subsidy payments would drop by $1.2 billion in 2026, and as a

result the net premium paid by a typical family would increase by up to $714 next year.  Add.64, Add. 66; *see* 90 Fed. Reg. at 27,208.

3.  Plaintiffs—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; the City of Chicago, Illinois; MSA, a national network of small businesses; and Doctors for America (DFA), a coalition of physicians and medical trainees—filed a complaint on July 1, 2025, challenging numerous provisions of the final rule, including the actuarial value policy.  ECF No. 1.  Plaintiffs moved the next day under 5 U.S.C. § 705 for a stay of the effective date of the challenged provisions.  ECF No. 11.

On August 22, 2025, the district court granted Plaintiffs' motion in relevant part and stayed the effective date of the actuarial value provision as well as six other provisions of the Rule.  Add.25, Add.27, Add.29.  The district court held that the Cities and MSA had standing to raise their claims, Add.39-Add.52, and reserved judgment as to whether DFA also had standing, Add.40.  The district court also concluded that the actuarial value provision was likely arbitrary, because CMS had failed to consider the purpose of the standard set forth in Section 18022(d)(3) and had failed to engage with commenters who noted that

the provision would raise costs for subsidized enrollees while worsening the risk pool overall.  Add.63-67.

Defendants filed a notice of appeal, ECF No. 39, and asked the district court for a stay pending appeal, Add.23.  The district court has not yet acted on Defendants' request.

## ARGUMENT

"A stay [pending appeal] is not a matter of right."  *Nken v. Holder*, 556 U.S. 418, 433 (2009).  A party seeking a stay "bears the burden of showing" that it is warranted, based on a consideration of "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Id.* at 433-34 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  As to the first factor, "[i]t is not enough that the chance of success on the merits be better than negligible."  *Id.* (internal quotation marks omitted).  "By the same token, simply showing some possibility of irreparable injury fails to satisfy the second factor."  *Id.* at 434-35 (internal quotation marks omitted).

**I.      Defendants Are Unlikely to Prevail on the Merits.**

**A. Plaintiffs Have Standing to Challenge the Actuarial Value Policy.**

1.  The district court correctly found that the Cities and MSA have standing to challenge CMS's new rule, including the actuarial value provision.  Add.48, Add.52.  To show standing, a plaintiff must have "suffered an injury in fact" that is "fairly traceable to the challenged conduct of the defendant," and "that is likely to be redressed by a favorable judicial decision.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs have made this showing.

2.  Defendants argue that MSA lacks standing insofar as it has not shown that its members would face higher costs under the rule.  Mot. 17.  The rule directly imposes these higher costs on MSA's members.  By permitting cheaper, but less comprehensive, plans to qualify at the "silver" level of coverage, the rule will lower tax credits across the board for any subsidized enrollee in the ACA Exchanges, including MSA member Brooke Legler.  *See* Add.33, Add.64.

Ms. Legler's chronic medical condition makes her "dependent on substantial medication" for treatment, including a biologic that is covered by her marketplace plan and costs about $10,000 a month.  Add.115.

11

Given her medical condition, she needs to maintain comprehensive coverage that covers these medications, which she can only afford thanks to the ACA's premium tax credits. *Id.* She will remain eligible for these tax credits next year, and will enroll in a plan that matches her current level of coverage. Supp.Add.21. Thus, if the actuarial value rule were to go into effect, she would receive a lower tax credit and pay a higher net premium for the same level of coverage. *Id.* These additional costs qualify as an injury in fact that is traceable to CMS's rule. *See* Add.43.

3. Similarly, Defendants are incorrect to minimize the impact of the rule on the Cities. By permitting issuers to market less generous plans, CMS would expose enrollees to higher cost sharing when they obtain care, leaving these consumers who remain enrolled more likely to be *under*insured. In addition, the rule would cause consumers to drop coverage, as fewer consumers would consider their higher net premiums to be a worthwhile bargain. Ctr. on Budget & Policy Priorities comment at 34-35 (Apr. 11, 2025), https://perma.cc/KP9W-J63N; Jason Levitis et al. comment at 5 (Apr. 11, 2025), https://perma.cc/X3KY-KZLW. Cities, as providers of last resort, will be left to bear the resulting uncompensated care costs, as CMS itself acknowledged in its

rulemaking. 90 Fed. Reg. at 27,145, 27,192; *see* Supp.Add.2-4; Supp.Add.7-8; Supp.Add.10-14. The district court thus also correctly found that the Cities' injuries are traceable to CMS's rule. Add.50-52.

These are not "self-inflicted injuries." Mot. 16. Defendants' suggestion—that the Cities could avoid costs simply by "choosing [not] to provide services to their residents," *id.*—blinks reality. Among other things, cities have legal obligations to provide emergency ambulance services for their populations. *See, e.g.*, Ohio Rev. Code Ann. § 4765.35(A); Columbus, Ohio, City Code § 1934.01. And even if there are "alternative paths for consumers to take that do not end with an uncompensated ride in a Columbus ambulance," Mot. 15, there will be more such rides as a result of CMS's rule, and the Cities will be injured when they are not paid for those rides. Supp.Add.3-4.

4. Defendants assert that a plaintiff may not base standing on a claimed injury that is "'too speculative' and too 'far removed from its distant (even if predictable) ripple effects.'" Mot. 15 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)). The district court correctly noted, however, that standing can be shown through a "predictable chain of events leading from the challenged government

13

action to the asserted injury." Add.45 (quoting *All. for Hippocratic Med.*, 602 U.S. at 385); *see also Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2136 (2025). And the district court also correctly reasoned that it is readily predictable—indeed, it was predicted by the agency itself—that a rule that leads to lower rates of insurance coverage will cause greater costs for cities that are responsible for providing uncompensated care. Add.50. This suffices to show the Plaintiff Cities' standing.[1]

## B. The Actuarial Value Policy Is Likely Arbitrary and Capricious.

1. The district court correctly determined that the final rule's actuarial value policy is likely arbitrary, for two reasons. First, it reasoned that "the purpose of the [de minimis] standard is set forth in section 18022(d)(3) itself and the only permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates,' not variations to reflect a new Administration's policy preference for less generous subsidies." Add.65 (internal quotation marks and alterations omitted). Because CMS had failed to consider the purpose of the standard in setting its actuarial value policy, it acted

---

[1] Plaintiffs maintain that DFA has standing for similar reasons, but the district court did not decide that question. Add.40.

arbitrarily. *Id*. (citing *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018)).

Second, CMS's reasoning was "conclusory and unsupported by evidence." Add.66. The agency failed to engage with the points raised by commenters that the rule would decrease subsidies for coverage on the Exchanges by $1.2 billion in 2026, would raise the cost of coverage for a typical family of four by $714 per year, and would worsen the risk pool, leading to higher premiums across the board. *Id*. Although CMS stated simply that it "expected" the rule to lower premiums in the long run, the district court held that such a conclusory dismissal of commenters' concerns could not qualify as reasoned decisionmaking. *Id*.

Defendants do not identify any error with respect to either holding.

2. The statute does not provide CMS with carte blanche to permit any range of actuarial valuations that it wishes, even to the point of almost completely erasing the distinction between bronze and silver coverage. Instead, CMS may provide only for a "de minimis variation" in these valuations. 42 U.S.C. § 18022(d)(3). And "[w]hether a particular activity is a *de minimis* deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard."

*Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 232 (1992); *see also Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 378 (4th Cir. 2011) (Wilkinson, J., concurring in part and concurring in the judgment) ("to give the de minimis rule too broad a reach would contradict congressional intent by denying proper effect to a statute"). CMS gave no consideration at all to the purpose of the statutory standard, which, again, is to account for differences in actuarial estimates. *See* 90 Fed. Reg. at 27,174-78. Because the agency "entirely failed to consider an important aspect of the problem," *Sierra Club*, 899 F.3d at 293, the district court correctly held that the rule was arbitrary.

Defendants acknowledge that "HHS must consider differences in actuarial estimates when it sets the de minimis range." Mot. 23. This concession is fatal to their motion, because the agency provided no indication in the rulemaking that it understood, or attempted to fulfill, this obligation. So Defendants instead attack a straw man. They assert that the district court erred in holding that the statute "permits the agency to consider *only* 'differences in actuarial estimates'" when setting a "de minimis" range. Mot. 21 (emphasis in original).

But the district court said no such thing. Rather, it concluded that the agency had erred by failing entirely to consider the statutory purposes of the de minimis standard. And because CMS completely failed to fulfill this obligation, the district court had no occasion to consider the separate question of whether, or to what extent, CMS may take into account any additional considerations in evaluating how wide a range is permissibly "de minimis" in accounting for differences in actuarial estimates. There may be room to argue over that point at the margins, but certainly a rule that all but completely erases the statutorily mandated ten-percentage-point distinction between the actuarial values of bronze and silver coverage, 42 U.S.C. § 18022(d)(1), exceeds the agency's authority. *See Wis. Dep't of Revenue*, 505 U.S. at 232.

3. The district court's first holding is enough to sustain its order. But Defendants fail to identify any error in its second holding, either. Defendants concede that the rule would change the inputs for the statutory tax credit formula across the board, amounting to $1.2 billion less in credits being awarded for 2026. 90 Fed. Reg. at 27,208. They also do not dispute commenters' calculations that a typical family of four

would pay $714 more per year for equivalent coverage under the rule. *Id.* Yet they inexplicably contend that enrollees would not necessarily be "worse off," Mot. 23, because an enrollee could still pay the same amount in premiums for a benchmark plan.

This ignores the fact that the benchmark plan would now offer lower-value coverage, meaning that the enrollee could keep net premiums constant only by enrolling in a plan that calls for higher cost-sharing payments. Alternatively, an enrollee who wishes to maintain the same level of coverage would necessarily pay more in net premiums. These harms would apply across the board, because the tax credit for every subsidized enrollee depends on the cost of the benchmark plan, no matter which plan he or she enrolls in.

Defendants attempt to defend their rule as one designed to bring unsubsidized enrollees into the market by offering plans with lower premiums and less generous coverage. Mot. 24. As the district court correctly held, Add.66-67, the agency failed to adequately explain this rationale. CMS stated simply that it "expected" the rule would lower premiums in the long run by drawing in healthier, unsubsidized enrollees. 90 Fed. Reg. at 27,177. Apart from that conclusory statement,

it failed entirely to engage with commenters who raised the substantial body of empirical research showing that, on balance, a reduction in subsidies will cause healthier people to drop out of coverage, resulting in a weaker risk pool and higher premiums. Ctr. on Budget & Policy Priorities comment at 34–35 (Apr. 11, 2025), https://perma.cc/KP9W-J63N; Jason Levitis et al. comment at 5 (Apr. 11, 2025), https://perma.cc/X3KY-KZLW. The district court correctly noted that "[s]uch nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking," Add.66 (internal quotation omitted), and the rule is invalid for this reason as well.

## II.    Defendants Face No Irreparable Harm from the District Court's Order, but Plaintiffs and the Public Will Be Irreparably Harmed by a Stay.

1. Although Defendants raise the specter of "chaos" in insurance markets absent a stay, Mot. 1, a careful review of their filing reveals that they perceive no such threat. They concede that CMS will be able to unwind its unlawful policy before this fall's open enrollment period. Add.7. (Indeed, they could hardly contend otherwise, given their previous argument that the district court could wait until later in the

year to award effective relief.   Add.95-96.)   They base their motion instead on the possibility that some insurers might make mistakes in revising their plan offerings, or that some insurers might choose to drop out of the market.  Defendants offer nothing more than speculation that either eventuality might occur, however, and there is no reason to believe that either consideration presents a serious concern.

2.  As noted above, CMS departed from its ordinary practice when it began a second round of rulemaking in March 2025, while the rate filing season was already underway.   Supp.Add.28.   The agency's actuarial value proposal was immediately controversial, and well-advised issuers therefore most likely planned for the possibility that the new actuarial value policy would not survive a legal challenge.   *Id.* Indeed, CMS itself encouraged issuers to engage in this contingency planning, given the uncertainties in the legal landscape that would govern the Exchanges for the coming year.  Supp.Add.29.

As a result, there is at most a minimal risk that issuers will be unable to revert their plan offerings to the rules that were in place at the beginning of the rate filing season, and that had remained in place through June 2025.  Supp.Add.29.  And there is no reason at all to suspect

that any insurer will drop out of the market in response to the district court's order, because any such insurer would have announced its intent to do so by now. *Id.*

3. CMS's experience with other late-breaking policy changes provides confidence that the agency, state regulators, and issuers will be able to respond to the district court's order. On October 12, 2017—only nineteen days before the beginning of the 2018 open enrollment period—the agency announced that it would no longer make cost-sharing reduction payments to issuers of plans on the Exchanges. Supp.Add.24. This last-minute policy change required regulators and issuers to work together to redesign plan offerings in time for open enrollment. Supp.Add.25-26. These efforts succeeded. Supp.Add.25. The redesign in October 2017 occurred over a much more compressed timeline than stakeholders face now, thereby demonstrating that regulators and issuers will be able to revert to the pre-existing actuarial value rules over the next two months. *Id.*

CMS must share this confidence, because—even in the days since Defendants filed their stay motion—the agency has announced further policy changes that will prompt insurers to resubmit their 2026 plan

21

offerings. This past Thursday, CMS unexpectedly broadened the eligibility standards for enrollment in so-called "catastrophic coverage." CMS, *Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-Sharing Reductions Due to Income, and Streamlining Exemption Pathways to Coverage* (Sept. 4, 2025), https://perma.cc/DGJ5-QESL. Catastrophic plans offer coverage roughly similar to bronze plans, but are treated differently for premium rating purposes. *See* 42 U.S.C. § 18022(e); 45 C.F.R. § 156.80(d)(2)(v). Insurers price their plans to account for the fact that enrollees in catastrophic plans are generally healthier than enrollees in metal-tier coverage. CMS's new announcement has rendered insurers' pricing assumptions for these plans obsolete, and as a result insurers will likely seek to reprice their 2026 offerings in the coming weeks. *See* State Health and Value Strategies, *New Guidance Expands Pool of Individuals Eligible to Purchase Catastrophic Plans* (Sept. 5, 2025), https://perma.cc/KV56-LW93. And insurers will seek to do so <u>whether or not the district court's order is stayed</u>, given the agency's unrelated policy shift.

4. Indeed, Defendants concede that they will be able to implement the district court's order. Add.7. They instead assert that there is a "significant risk" that an issuer would remove a noncompliant plan from its offerings rather than revising that plan, or that an issuer would make mistakes in attempting such a revision. *Id*. Defendants cannot meet their heavy burden to justify a stay pending appeal with speculation about such possibilities, *see Nken*, 556 U.S. at 434-35, particularly where the agency itself created the issue by rushing to promulgate mid-year (or even later) policy changes, *cf. Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (proponent of emergency relief may not complain of self-inflicted harms).

In any event, Defendants vastly overstate the task that issuers now face. Although 80% of issuers on the federal Exchange may be planning on offering at least one plan with wider actuarial value variations, Add.8, this does not mean that 80% of plans would need to be resubmitted. These issuers intend to offer multiple plans on the federal Exchange, and most of those offerings are likely already in compliance with the pre-

existing actuarial value policy.[2]  Data for the current year would be held by CMS or by amicus America's Health Insurance Plans, but neither entity has made that data publicly available.  On the basis of a review of analogous data from 2022, however, it is likely that at most one out of four plan offerings would need to be revised this year.  Supp.Add.27. Indeed, the proportion of plans that would require revisions could be considerably smaller.  Under rules that were adopted after 2022, issuers on the federal Exchange are required to offer standardized plans (which by definition could not offer wider actuarial value ranges), and these issuers may offer only a limited number of non-standardized plans. Supp.Add.27-28; *see* 45 C.F.R. §§ 156.201(b), 156.202(b).

So the vast majority of the plans on the federal Exchange that already comply with the narrower actuarial value ranges would require no new action, as CMS itself recognized when it issued its final rule.  *See* 90 Fed. Reg. at 27,176 (declining suggestion to delay changes until 2027

---

[2] Similarly, although Defendants assert that the order "would affect 99.6 percent of consumers" on the federal Exchange, Mot. 11, this does not mean that 99.6% of consumers would be enrolled in a noncompliant plan.  It instead means that these enrollees would shop in a market that includes at least one noncompliant plan, *see* Add.8, thereby almost certainly reducing the tax credits they would otherwise be entitled to, but still leaving them with a broad range of compliant plans to choose from.

because issuers would not be required "to take any additional action to revise existing plan designs"); *see also id.* at 27,218 (same). And, as noted, even for the smaller fraction of plans that do require revisions, there is no reason to suspect that regulators and issuers will be unable to complete those changes. Supp.Add.29.

5. The equities thus weigh heavily against a stay pending appeal. Defendants, on one hand, only speculate that there may be some hiccups while issuers work to revert a subset of their plan offerings to the rules that were in place earlier this year. On the other hand, Plaintiffs and the public would suffer irreparable harm if the actuarial value rule were to go into effect now. Virtually all subsidized enrollees on the Exchanges would face higher costs, as the rule would reduce PTCs next year by $1.2 billion, resulting in a typical family of four paying $714 more for their health care needs per year. 90 Fed. Reg. at 27,208. Although Defendants have (incorrectly) attempted to explain away these harms as a worthwhile trade-off to bring unsubsidized enrollees into the market, even under their own theory there would be an "initial weakening of the risk pool," *i.e.*, in 2026, and the "long-term benefits" would be realized only in later years. *Id.* at 27,177. The *Nken* factors thus all point in favor

25

of protecting affordable coverage for 2026 by maintaining the district court's order during the pendency of the appeal.

## CONCLUSION

This Court should deny Defendants' motion.

Respectfully submitted,

*/s/ Joel McElvain*
Joel McElvain
Cortney Robinson
Christine L. Coogle
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs-Appellees*

Dated: September 8, 2025

## CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,098 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f). This filing also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ *Joel McElvain*
Joel McElvain

September 8, 2025

## CERTIFICATE OF SERVICE

I certify that on September 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

_/s/Joel McElvain_
Joel McElvain