No. 25-2012

I N T HE

# United States Court of Appeals for the Fourth Circuit

———————————

CITY OF COLUMBUS, *et al.*,

*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services, et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 1:25-cv-02114

———————————

## SUPPLEMENAL ADDENDUM TO RESPONSE
## IN OPPOSITION TO MOTION FOR STAY PENDING APPEAL

———————————

Joel McElvain
Cortney Robinson
Christine L. Coogle
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

Declaration of Edward Johnson,
    Dkt. 11-7 (July 2, 2025) ...................................................... Supp.Add.1

Declaration of Faith Leach,
    Dkt. 11-8 (July 2, 2025) ...................................................... Supp.Add.5

Declaration of Dr. Olusimbo Ige,
    Dkt. 11-9 (July 2, 2025) ...................................................... Supp.Add.9

Comment of National Association of Insurance
    Commissioners, Dkt. 33-2 (Aug. 17, 2025) ...................... Supp.Add.15

Second Declaration of Brooke Legler,
    Dkt. 44-1 (Sept. 2, 2025) ................................................... Supp.Add.20

Second Declaration of Christen Linke Young,
    Dkt. 44-2 (Sept. 2, 2025) ................................................... Supp.Add.23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS *et al.*,

       *Plaintiffs*,

v.

ROBERT F. KENNEDY JR. *et al.*,

       *Defendants*.

Case No. 25-cv-2114

## DECLARATION OF EDWARD JOHNSON

I, Edward Johnson, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.    The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' challenge to the Centers for Medicare & Medicaid Services rule, "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability."

2.    I am currently the Assistant Public Health Commissioner for External Affairs for the Columbus Department of Public Health ("Columbus Public Health"). I have served as an Assistant Public Health Commissioner for close to three years. Prior to my role as Assistant Public Health Commissioner, I served Columbus Public Health as the Director of Public Health Policy for over four years.

3.    As Columbus Public Health's Assistant Public Health Commissioner for External Affairs, I assist the Health Commissioner with representing the needs and concerns of Columbus's residents to protect their health and improve their lives.

4.    Plaintiff the City of Columbus is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Columbus has all the powers of local self-government and home rule

1

**Supp.Add.1**

under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Columbus.[1]

5.    Columbus, located in Franklin County, is the capital of Ohio. It is the largest city in the state and the fifteenth largest city in the United States, with a population of nearly 905,748, according to the 2020 Census.[2]

6.    According to 2022 Census estimates, 10.8% of Columbus's population under the age of 65 lacks health insurance.[3]

7.    Columbus provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care.

8.    Columbus Public Health employs close to 600 employees who operate more than 90 different public health programs and provide critical services to residents. These programs and services include disease investigation, immunizations, and testing, treatment, and prevention of sexually transmitted infections, among others.[4]

9.    Columbus Public Health subsidizes a community health center, which faces greater demand from uninsured or underinsured individuals who cannot obtain health care elsewhere as the uninsured and uninsured rate rises.

10.    Columbus Public Health also financially supports PrimaryOne Health, which is a collection of eleven Columbus neighborhood health centers in medically underserved areas. PrimaryOne

---

[1] *See City Code and Charter*, City of Columbus, https://library.municode.com/oh/columbus/codes/code_of_ordinances; O.R.C. § 715.01.

[2] *QuickFacts,* U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/columbuscityohio/PST045224.

[3] *Id.*

[4] *More About Columbus Public Health,* City of Columbus, https://www.columbus.gov/Services/Public-Health/About-Public-Health/About-Columbus-Public-Health.

**Supp.Add.2**

is designed to be a "system of health center sites throughout Columbus and Franklin County to serve the health care needs of vulnerable, un/under and insured residents within the community."[5] If the rate of uninsured or underinsured individuals increases, then the PrimaryOne Health centers will necessarily see even more patients, and either Columbus will have to provide them with additional funding or they will have to decrease the range of services or patients they are able to cover.

11.    Columbus Public Health also operates a number of specialty clinics for alcohol and drug abuse prevention, dental services, family planning, immunizations, sexual health, tuberculosis control, women, infants, and children nutrition, and women's health and wellness.[6] Each of these clinics operates on a free or reduced-fee scale and principally serves the uninsured and underinsured populations.[7] As with PrimaryOne Health, growth in the uninsured and underinsured population will translate to additional costs for Columbus.

12.    Columbus also maintains "one of the best Emergency Medical Services (EMS) in the United States," operated by the Columbus Division of Fire.[8] That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the call.

13.    If possible, "[r]eimbursement for the expense of emergency ambulance transport is sought from a patient's Medicare, Medicaid, or commercial health insurance provider."[9] If an individual "live[s] in the City of Columbus and do[es] not have health insurance coverage, [they] will

---

[5] *The History of PrimaryOne Health,* PrimaryOne, http://www.primaryonehealth.org/about/.

[6] *See About Columbus Public Health,* City of Columbus, https://www.columbus.gov/Services/Public-Health/About-Public-Health.

[7] *See, e.g., Dental Clinic,* City of Columbus, https://www.columbus.gov/Services/Public-Health/Find-Health-Care-Resources/Dental-Services.

[8] *Division of Fire,* City of Columbus, https://www.columbus.gov/Services/Public-Safety/Fire/About-Us/Reports/EMS-Report.

[9] *Id.*

**Supp.Add.3**

not receive a bill for transport"; thus, "no Columbus resident will pay anything 'out of pocket' as the result of being transported to a hospital by The Columbus Division of Fire."[10] They will still receive a bill, but it does not get sent to collections. Thus, while Columbus recoups the majority of its costs for transportation for individuals with private insurance, Columbus only recoups a small fraction of its costs for uninsured individuals. For that reason, reimbursements "in no way cover all the costs incurred for treatment and transport."[11]

14.    An increase in the number of uninsured or underinsured individuals will result in more transports for which Columbus does not receive reimbursement and thus must make up for the shortfall in its budget.

15.    Aside from these budgetary impacts, Columbus—a city of over 900,000 people, with an economy of approximately $182 billion—is harmed by the need to care for a population that is increasingly uninsured. When individuals cannot seek medical treatment, they are necessarily less healthy, less productive, and less able to participate in city life. That has ripple effects throughout the City's programs and the community.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 1, 2025

Columbus, Ohio

_J. Edward Johnson_

_____
EDWARD JOHNSON

---

[10] *Id.*

[11] *Id.*

4

**Supp.Add.4**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS *et al.*,

        *Plaintiffs*,

v.

ROBERT F. KENNEDY JR. *et al.*,

        *Defendants*.

Case No. 25-cv-2114

### DECLARATION OF FAITH LEACH

I, Faith Leach, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am the Chief Administrative Officer of the City of Baltimore. I have served in this role since March 2023. In my role, I manage the day-to-day government operations across the entire City enterprise, ensuring the effective, efficient, and equitable delivery of City services.

3.      Baltimore is the largest city in Maryland and the thirtieth largest city in the United States, with a population of around 568,000 according to 2024 Census estimates.[1]

4.      According to 2024 Census estimates, 6.7% of Baltimore's population under the age of 65 lacks health insurance.[2]

---

[1]    *QuickFacts*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/baltimorecitymaryland/PST045224.

[2]    *Id*.

5.      The City of Baltimore is a municipal corporation organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles.

6.      The Baltimore City Health Department (BCHD) is a City agency and the oldest continuously operating health department in the United States. BCHD has wide-ranging responsibilities for providing health services to residents of the City, including those related to acute communicable diseases, chronic disease prevention, HIV/STD, maternal-child health, school health, and senior services. My duties as Chief Administrative Officer include oversight of BCHD, which is staffed by approximately 900 employees and has an annual budget of approximately $200 million.

7.      In particular, BCHD operates a number of specialty clinics out of two principal facilities. These include clinics for reproductive health, sexually transmitted diseases, dental and oral health care, and immunizations.[3]

8.      The Baltimore City Health Department also provides or subsidizes a number of other services for Baltimore's uninsured and underinsured residents. In particular, the Department funds a visiting-nurse program that makes house calls for older adults, including those with chronic health conditions like diabetes, hypertension, asthma, and mental health disorders. The Department also funds a number of other programs focused on specific health conditions, including a Community Asthma Program, a Tuberculosis Control Program, a Childhood Lead Poisoning Prevention Program, and programs for substance abuse.[4] And the

---

[3]      *Health Clinics & Services*, Baltimore City Health Department, https://health.baltimore city.gov/programs/health-clinics-services.

[4]      *See, e.g.*, *Asthma*, Baltimore City Health Department, https://health.baltimorecity.gov/ node/454; *Health Clinics & Services*, Baltimore City Health Department, https://health.baltimore city.gov/programs/health-clinics-services; *Lead Poisoning*, Baltimore City Health Department,

Department subsidizes a number of other entities that provide services to Baltimore residents, including the Baltimore Family League and Health Care Access Maryland.

9.     An increase in the uninsured rate will impose additional burdens on each of these programs and therefore require more funding from the City.

10.     The Baltimore City Fire Department (BCFD) also maintains an ambulance system that responds to calls covering 92 square miles with a daytime population exceeding 1,000,000. BCFD's emergency medical service seeks reimbursement for its costs from patients' Medicare, Medicaid, or commercial health insurance, but BCFD answers calls regardless of the individuals' health insurance coverage or ability to pay. In 2023, with a budget of more than $62 million for emergency medical services, BCFD answered over 145,000 emergency medic calls, including 15,398 from uninsured residents. In 2024, BCFD answered roughly the same number of total calls, including 17,259 from uninsured residents.

11.     If a patient lacks insurance, BCFD will seek reimbursement from the patient personally, making several attempts to collect on the debt. However, these attempts are rarely successful. While EMS was able to recoup about 90.5% of costs from patients with insurance coverage, it only recovered 3.8% of costs from uninsured patients.

12.     Thus, an increase in the number of uninsured and underinsured individuals results in more ambulance calls for which Baltimore does not receive reimbursement and thus must make up for the shortfall in its budget.

13.     In addition, as one of the busiest emergency medical services departments in the nation, BCFD's emergency medical service is often taxed beyond its capabilities. Wait times

---

https://health.baltimorecity.gov/lead/lead-poisoning; *Substance Use and Misuse*, Baltimore City Health Department, https://health.baltimorecity.gov/programs/substance-abuse; *Tuberculosis*, Baltimore City Health Department, https://health.baltimorecity.gov/node/164.

exceed national rates, and transport units often wait up to an hour to offload patients. To help reduce strain on our overburdened emergency systems, BCFD developed the population health program. BCFD's Population Health Units are a community-focused arm of its EMS Division, designed to improve public health outcomes by delivering care outside the traditional 911-response model. These units are central to Baltimore's shift toward proactive, community-based healthcare. By integrating EMS with public health strategies including harm reduction, in-home care, and transitional support, the unit works to reduce unnecessary 911 calls, emergency department strain, and hospital readmissions, while improving access, equity, and outcomes across vulnerable communities. An increase in the uninsured rate will only increase the avoidable use of acute health services that these programs are designed to address, causing further strain on a system that is already overstretched.

14.    Finally, Baltimore—a city of over 560,000 people, at the center of a $259.7 billion regional economy—is harmed by the need to care for a population that is increasingly uninsured. When individuals cannot seek medical treatment, they are necessarily less healthy, less productive, and less able to participate in city life. That has ripple effects throughout the City's programs and the community.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 30, 2025.

Baltimore, MD

_____

Faith Leach

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS *et al.*,

        *Plaintiffs*,

    v.

ROBERT F. KENNEDY JR. *et al.*,

        *Defendants*.

No. 25-cv-2114

**DECLARATION OF DR. OLUSIMBO IGE**

I, Dr. Olusimbo Ige, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      I am a resident of the City of Chicago ("City" or "Chicago") in the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I currently serve as Commissioner of Chicago's Department of Public Health ("CDPH"). I have held this position since December 2023. Before my appointment as CDPH Commissioner, I served as the Managing Director of Programs at the Robert Wood Johnson Foundation. There, I oversaw partnerships with health organizations nationwide working towards making public health and health care systems accountable and equitable. Previously, I served as the Assistant Commissioner for the New York City Department of Health and Mental Hygiene, where I provided oversight to a wide range of programs, including New York City's pandemic response, food security programs, housing and health initiatives, mental health programs, violence prevention, and the Public Health Corps initiative.

1

**Supp.Add.9**

3.      I have a Bachelor of Medicine and Surgery and a Master of Science degree in Epidemiology and Biostatistics from the University of Ibadan in Nigeria. I received a Public Health Master's degree from the University of Manchester in the United Kingdom.

4.      As Commissioner of CDPH, I make strategic decisions, in collaboration with the Mayor's Office and stakeholders across the City, to manage public health threats; design and deliver disease control services; and protect the food, air, and environment for 2.7 million Chicago residents.[1] I serve as a liaison and subject matter expert on all related policy matters, and use of authorities and resources to promote and protect public health. I have built and currently manage an executive team of ten professionals, a budget of $750M, and approximately 760 employees, with a dedication to sustaining a strong public health workforce and capacity.

5.      CDPH's overarching mission is to work with communities and partners to create an equitable, safe, resilient, and healthy Chicago. While Chicago does not operate a fully integrated health and hospital system, the Department operates seven mental health centers that provide low-barrier services to uninsured and underinsured Chicago residents, four immunization clinics, and three clinics that provide free testing and treatment for sexually transmitted infections. The City also provides certain at-home and in-field health programs, such as nursing home support for pregnant people and newborn babies and directly observed therapy for tuberculosis. Additionally, the City funds and staffs a network of Women, Infants, and Children (WIC) clinics providing nutrition counseling and supplemental food to pregnant, post-partum and breastfeeding women, their infants and children. Collectively, these clinics and services serve thousands of uninsured and underinsured City residents and support the City's safety net for health-related services. Each of these clinics faces greater demand when there is an increase in either the health needs of Chicago

---

[1] U.S. Census Bureau QuickFacts (V2024).
https://www.census.gov/quickfacts/fact/table/chicagocityillinois/HSG010224.

**Supp.Add.10**

residents or in the number of uninsured or underinsured individuals who cannot obtain those services or other forms of health care elsewhere.

6.      I am deeply concerned with CMS's "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability Final Rule" and its potentially harmful impacts on our residents. In Chicago, nearly one in ten residents is uninsured.[2] The Rule would significantly increase barriers to coverage and the number of uninsured residents, increase health care costs for residents, and further burden the City's health care safety net. Under the guise of increased "integrity" and "affordability," the Rule would implement exactly the opposite. For example, eliminating monthly Special Enrollment Periods for individuals with low incomes to enroll in coverage outside of standard enrollment cycles will make affordable insurance harder to obtain for many Chicago residents. The monthly Special Enrollment Periods are a safeguard for people and families who experience unexpected life events. A single parent in our City working part-time with fluctuating work hours and income too high for Medicaid would lose the ability to enroll in affordable coverage outside of the regular enrollment period.

7.      Per our Department's analysis of CMS data, 113,038 Chicagoans are enrolled in Marketplace coverage, and the overwhelming majority (approximately 98,908 residents) receive premium tax credits, or subsidies from the federal government, to make their coverage more affordable.[3] The Inflation Reduction Act of 2022 enhanced these subsidies through the end of 2025 and the average tax credit among Chicagoans enrolled in Marketplace coverage is $431.[4] With the anticipated end of these subsidy enhancements after 2025 leading to higher monthly premiums, the Rule will compound the effect on Marketplace enrollees by allowing insurers to deny new

---

[2] Chicago Health Atlas. Uninsured rate. https://chicagohealthatlas.org/indicators/UNS?tab=map.
[3] Centers for Medicare and Medicaid Services. 2025 Marketplace Open Enrollment Period Public Use Files. CMS.gov. https://www.cms.gov/data-research/statistics-trends-reports/marketplace-products/2025-marketplace-open-enrollment-period-public-use-files.
[4] Id.

3

**Supp.Add.11**

coverage for individuals with past-due premiums. This alarming rise in premium costs would lead to potentially thousands of Chicago residents losing health insurance, and thus losing access to preventative services to keep them out of the hospital, primary care, mental health services, and medications, in addition to causing unnecessary and unsafe disruption to residents undergoing active treatment.

8.    Residents who lose health coverage would likely delay essential visits – including preventative screenings, primary care appointments, and recommended treatments – until conditions worsen and emergency care and hospital services are needed. This would lead to later-stage disease detection, higher risks of complications exacerbated by untreated chronic diseases, and increased utilization of Chicago's emergency departments and hospitals – increasing uncompensated care and further straining safety net providers in our City beyond repair.

9.    The higher the uninsured and underinsured rate, the more that the clinics operated by CDPH and its community-based partners will necessarily have to provide forms of low-barrier and reduced-cost care to patients. In that event, Chicago either must provide the Department and its partners with more funding, or the Department and its partners must decrease the services that they provide. Furthermore, the Department works collaboratively with the State of Illinois, Cook County, and service providers across the City to strengthen resource navigation for Chicago residents who are uninsured and underinsured. The Rule's effects will increase the burden on the City to coordinate essential resources and services across agencies and sectors to ensure that the hardest-to-reach communities receive care.

10.    The Department also partners with all hospitals and healthcare organizations in the City through the Healthcare System Preparedness Program, which supports the Chicago Health System Coalition for Preparedness and Response. This program includes coordination of all thirty-five acute care and specialty hospitals, 110 long term care facilities, 50 dialysis centers, all

4

**Supp.Add.12**

Federally Qualified Health Centers, and other organizations that provide health care services within the City.

11.  This program includes safety net hospitals which, as part of their participation, demonstrate their ability to react to patient surges and complete accreditation requirements. Safety net hospitals provide healthcare for individuals regardless of their insurance status or ability to pay, and typically serve a higher proportion of uninsured, low-income, and other vulnerable individuals than do other hospitals.

12.  Chicago's partnership with these hospitals includes financial support such as situational awareness communication, support for data collection and reporting, disaster exercises, clinical trainings, and providing supplies, such as personal protective equipment, mechanical ventilators, and radios. In particular, this program benefits patients during surge events, like the COVID-19 pandemic and other public health emergencies.

13.  The Chicago Fire Department provides ambulance transportation services to its residents, including its uninsured and underinsured residents, and regardless of income and insurance status. Chicago generally seeks reimbursement for ambulance services from the patient or, if applicable, the patient's insurer. However, Chicago usually does not receive full reimbursement for ambulance services from its uninsured and underinsured residents. For example, based on our review of Chicago Fire Department ambulance records, in 2024, the City provided 56,556 ambulance transports to Chicago residents for whom no insurance was identified. The City's net charges for these patients were $173,672,181, but the City collected just $5,647,941 – a loss of over $168 million. The Rule would only exacerbate this loss further, and other big cities and jurisdictions will also likely experience similar shortfalls.

14.  In Chicago's experience, the uninsured and underinsured disproportionately rely on ambulance services for transport to the emergency department. Such individuals, for instance, are

5

**Supp.Add.13**

more likely to wait until their conditions become more severe and then use ambulance services to receive necessary care. A higher number of uninsured and underinsured individuals will therefore result in more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget. Aside from these budgetary impacts, Chicago is harmed by the need to care for a population that is increasingly uninsured. When individuals cannot seek medical treatment, they are necessarily less healthy, less productive, and less able to participate in city life – all of which has cascading impacts throughout the City's programs and the community.

15.     We are alarmed by the potential harms of this Rule on our City's residents, including our most vulnerable communities for which other forms of health coverage are out of reach. The Rule would significantly degrade access, affordability, and the integrity of Marketplace coverage for our residents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 1, 2025

Chicago, Illinois

_____
Dr. Olusimbo Ige

6

**Supp.Add.14**



NATIONAL ASSOCIATION OF
INSURANCE COMMISSIONERS

April 10, 2025

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9884-P
P.O. Box 8016
Baltimore, MD 21244-8016

Via Regulations.gov

To whom it may concern:

The following comments on the proposed 2025 Marketplace Integrity and Affordability Proposed
Rule (Proposed Rule), as published in the Federal Register on March 19, 2025, are submitted on
behalf of the National Association of Insurance Commissioners (NAIC) which represents the chief
insurance regulators in the 50 states, the District of Columbia, and 5 U.S. Territories.

**Rule Timing Relative to Plan Year 2026**

State regulators wish to express great concern about the timing of the Proposed Rule given that it
proposes myriad changes to plan design and marketplace operations for plan year (PY) 2026. NAIC
urges CMS to reconsider the timing of the implementation of at least some provisions of the
Proposed Rule due to the additional burdens they place on regulators, marketplaces, health insurers,
and consumers for PY 2026.

With enhanced premium tax credits set to expire at the end of 2025 and potential Congressional
action on health programs like Medicaid, significant uncertainty already surrounds the 2026 markets.
Several provisions proposed in this rule only add to that uncertainty. At this point in the year, health
insurers have already completed their PY 2026 plan designs and must soon submit rates to their
state regulators. Insurers need to know the rules under which they will be operating to fully weigh
their options and develop appropriate plans and rates. They will not know the rules until this
proposal is finalized, so we expect rate increases to result from the uncertainty generated by these
late rule changes, as well as uncertainty over enhanced premium tax credits. To implement these
changes for PY 2026 will present significant challenges and could add to consumer and federal
costs.

The changes such as increasing consumers' maximum out-of-pocket costs, allowing issuers to design
plans with reduced actuarial values, and adding a $5 monthly penalty for consumers who do not
actively re-enroll in coverage could encourage consumers to leave the market. The impact of these
changes could result in fewer individuals enrolled in coverage in 2026 than in 2025, with those who
are youngest and healthiest being most likely to drop or not pursue coverage in 2026. Resulting

coverage losses would compromise the integrity and health of the risk pool, discourage carrier participation, lead to higher premiums, and destabilize state insurance markets. The possible extent of these changes and their impact on individual market risk pools needs to be known before plans and rates can be established for PY 2026.

The Proposed Rule would place new requirements on consumers, as well, such as additional paperwork submissions and the new $5 premium for some. It is critical that consumers understand these requirements before they go into effect. The required implementation of these changes for PY 2026 will present substantial consumer education challenges, especially in light of the substantial reductions in Navigator funding and the proposed open enrollment period reduction.

Finally, the additional administrative and systems changes that would be required of State-Based Marketplaces (SBMs) under this Proposed Rule will be burdensome and costly if they need to be implemented for PY 2026.

Given the concerns expressed above, we encourage CMS to move the implementation date of the new rules to PY 2027. If any changes are to be effective for PY 2026, the final rule must be published as soon as possible, preferably within a month of the comment deadline.

**Comment Deadline**

As we have noted with respect to past proposed rules, a 30-day comment period is too brief for a rule that proposes these many changes to complex policies applicable to health insurance issuers, regulators, marketplaces, and consumers. We urge CMS to provide a longer comment period in the future to allow stakeholders an adequate opportunity to analyze the proposed changes and formulate useful comments.

**State Flexibility on the Open Enrollment Period**

The Proposed Rule would require all states to run their Annual Open Enrollment period (OEP) exclusively from November 1 to December 15, with coverage beginning January 1 of the following year. There are valid operational and consumer protection reasons for states setting an OEP that varies from the Federal dates, such as providing additional time for consumers to make informed decisions about their coverage and allowing for flexibility in plans' start dates.

NAIC encourages CMS to allow SBMs to set OEP dates that best meet the needs of their consumers and markets, beginning before November 1 if the state chooses, or ending after December 15. Indeed, many SBMs have maintained consistent OEP dates that consumers and stakeholders have come to know and expect, providing market stability. Regulators do not believe that requiring SBMs to abandon existing consistency within their states to align with federal OEP dates provides any tangible benefits for consumers. Extending the Open Enrollment Period into January provides consumers with more time to choose a plan and provides the opportunity for plan switching for a brief period after the benefit year begins. A majority of SBMs have used their authority to extend open enrollment beyond December 15 but not all have chosen to do so. Some have chosen to extend later in December, but not into January. To avoid disruption in these states and preserve state flexibility, we urge this change to be made optional for SBMs.

2

**Supp.Add.16**

**State Flexibility on Other Proposals**

A number of other provisions in the Proposed Rule would limit the ability of SBMs to make their own choices and require them to adopt changes to their operations for PY 2026. The Proposed Rule would require SBMs to take action based on a single fail-to-reconcile notice; end extensions of the deadline for consumers to file paperwork to resolve income inconsistencies; stop the practice of reenrolling consumers into plans that save them money; and verify a greater share of special enrollment periods. The Proposed Rule also includes new limitations on the ability of states to establish their Essential Health Benefits (EHB), which impacted states will not have enough time to comply with if this provision goes into effect for PY 2026.

State regulators object to these limits to state authority. We urge CMS to maintain state flexibility in these areas permanently. If state flexibility is removed in these areas, states should be given sufficient time to make the necessary changes.

**Auto-Reenrollment**

The Proposed Rule would require two substantive changes to the auto-reenrollment process. It would establish a $5 monthly premium for consumers who are automatically re-enrolled and previously qualified for a monthly premium of $0 until the consumer actively confirms eligibility and enrollment. It also would remove the option for Marketplaces to re-enroll consumers who had selected a bronze plan into a silver plan, when that silver plan costs them the same or less and includes the same provider network. Both of these changes would be most burdensome on those who can afford it the least.

State regulators share the goal of ensuring that only eligible consumers receive premium tax credits. At the same time, we do not believe Marketplaces should establish unnecessary barriers to enrollment or continued enrollment. Current practices seek to ensure continued eligibility: consumers are required to report changes in their eligibility information to Marketplaces; the auto-reenrollment process includes checks of income and other eligibility data; and the reconciliation requirement at tax filing serves as a backstop to recoup improper APTCs. Adding the $5 premium as a barrier to continued enrollment would help to encourage some enrollees to update their information. However, it is also likely to lead some eligible enrollees to lose coverage, as a state entity would be required to withhold a federal tax benefit from its consumers, potentially without the consumer's awareness. We urge CMS to make this policy optional for SBMs, at the very least.

Re-enrolling consumers with bronze plans into silver can be very beneficial for consumers who qualify for cost-sharing reductions. State regulators recognize that some consumers lack understanding of the elements of health insurance cost-sharing, such as co-pays and deductibles. The concept of actuarial value is even less well understood, let alone that cost-sharing reductions are available only in silver plans. Consumers may enroll in bronze plans because they are unaware of the benefits of silver plans, invested too little time in choosing a plan and made their plan choice based exclusively on premium without fully understanding their total financial exposure when deductibles and cost-sharing are included, or received incomplete advice from a producer or assister. Nonetheless, some consumers may choose bronze plans knowing the benefits they are forgoing—current policy allows them to change back to a bronze plan if they are auto-reenrolled into silver. We support giving Marketplaces the option of retaining this feature of the reenrollment hierarchies so that SBMs can choose whether the revised hierarchy is in the best interests of consumers and insurance markets in their states.

3

**Supp.Add.17**

**Special Enrollment Period for Consumers with Low Income**

The Proposed Rule would end the monthly Special Enrollment Period for consumers eligible for APTC with income below 150% of the federal poverty level. As we pointed out in our comments when the policy was codified in the 2022 Notice of Benefit and Payment Parameters, the ongoing SEP creates some risk of adverse selection and increased premiums. However, we supported the option for SBMs to implement the policy and we continue to believe SBMs should have the choice.

We also urge CMS to take additional steps to combat unauthorized enrollments or plan transfers. We do not believe that the under 150% SEP is a major contributor to such improper practices – it was not a major problem for SBMs, which seems to indicate that FFM procedures are the key issue. CMS has already implemented system changes to limit unauthorized enrollments and has taken a more timely approach to suspending and terminating producers suspected of improper practices. We urge continued and expanded efforts in these areas to address vulnerabilities in the federal marketplaces, regardless of the final policy on special enrollments for low-income consumers.

**Co-Pay Accumulator Enforcement**

State insurance regulators urge CMS to move forward with rulemaking to clarify whether health insurers may operate co-pay accumulator programs and disregard the value of co-pay assistance provided by drug manufacturers or other third parties. After its co-pay accumulator rule was invalidated by judicial action in 2023, CMS has chosen not to enforce the previous rule. Some states have chosen to do so, but the lack of enforcement or clarity from federal regulators has introduced challenges. We ask CMS to publish a new rule on this topic as soon as possible and we would welcome the opportunity to share more state perspectives on enforcement.

Thank you for your consideration of these comments. We again strongly urge you to continue the historical position of state deference as you look to finalize this Proposed Rule. The flexibility afforded states in developing their Marketplaces has led to record enrollment across many of the SBMs and states have continued to develop innovative programs for the benefit of their constituencies. We welcome continued collaboration with CMS on our shared goals of healthy markets and consumer protection.

Sincerely,


*Jon Godfread*
NAIC President
Commissioner
North Dakota Insurance Department

*Scott White*
NAIC President-Elect
Commissioner
Virginia Bureau of Insurance

**Supp.Add.18**

*Elizabeth Kelleher Dwyer*
NAIC Vice President
Director
Rhode Island Department of Business
   Regulation

*Jon Pike*
NAIC Secretary-Treasurer
Commissioner
Utah Insurance Department

5

**Supp.Add.19**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS *et al.*,

       *Plaintiffs*,

v.

ROBERT F. KENNEDY JR. *et al.*,

       *Defendants*.

Case No. 25-cv-2114

### SECOND DECLARATION OF BROOKE LEGLER

I, Brooke Legler, declare as follows:

1.      I am over 18 years old and competent to make this declaration. I have personal knowledge of the facts and information in this declaration. I have previously submitted a declaration in this action. I respectfully provide this supplemental declaration to further explain why the cost increases that would be caused by the new Centers for Medicare and Medicaid Services rule, "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability," would threaten my ability to access medication that I require for my health and risk the loss of my small business.

2.      I am a member of the Main Street Alliance, which is a national association of approximately 30,000 small businesses.

3.      I am a resident of New Glarus, Wisconsin.

4.      I am a small business owner. My business is an early childhood education program with about 10 employees.

5.      I have rheumatoid arthritis and I am dependent on substantial medication to treat the condition, including medications that address secondary issues caused by the primary

medications. I also take a biologic to protect my health by suppressing my immune system, which costs about $10,000 per month.

6.      I purchase individual insurance on the Exchange and receive subsidized coverage under a silver "Quartz One Achieve" plan. I currently pay a net premium of about $200 per month, after application of the Affordable Care Act's subsidies for my coverage.

7.      My personal income will be about $30,000 for 2025. I project that my personal income in 2026 will be about the same amount. I understand that, at this income level, I will remain eligible for Affordable Care Act premium tax credits next year, even if legislation is not adopted to extend subsidies that are currently available for other people with higher income levels.

8.      My insurance covers my rheumatoid arthritis medications, and a portion of my biologic. I also qualify for payment assistance through the biologic drug company. I would not be able to afford the biologic, or my other medications, without health insurance, or with a less comprehensive insurance plan.

9.      As explained in my prior declaration, without access to an insurance plan with the benefits and affordability of my current coverage, I would not be able to afford the medications I need or continue my small business' operations.

10.      Accordingly, even if insurers are permitted to sell cheaper plans next year that offer less generous benefits, I would not wish to purchase such a plan. In shopping for a plan next year, I will seek to retain the comprehensive benefits that I have under my current plan, which I need to be able to afford my medications. If lower tax credits are available to subsidize my coverage, I will be required to pay more in net premiums to maintain the same level of coverage.

**Supp.Add.21**

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 2nd of September, 2025 in New Glarus, Wisconsin.


BROOKE LEGLER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

CITY OF COLUMBUS *et al.*,

       *Plaintiffs*,

v.

ROBERT F. KENNEDY JR. *et al.*,

       *Defendants*.

Case No. 25-cv-2114

---

### SECOND DECLARATION OF CHRISTEN LINKE YOUNG

I, Christen Linke Young, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.     The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' opposition to the motion for stay pending appeal. I have previously submitted a declaration in support of Plaintiffs' motion for interim relief.

2.     I am a visiting fellow with the Brookings Center on Health Policy, a research center within the Economic Studies program at the Brookings Institution. My research concerns a variety of topics in health policy, including issues related to health insurance: how Americans get health care coverage, how that coverage is financed, and how the health care system can be improved to make coverage more affordable and accessible. I have published many pieces of scholarly analysis on these topics. I have testified before Congress and before state legislatures, my work is frequently cited in national media, and I have served in multiple leadership roles in state and federal government. My full curriculum vitae, including a list of publications, was submitted as an Appendix to my first declaration.

**Summary of Observations**

3.      Implementing more narrow *de minimis* ranges will require action by federal and state regulators and by issuers over the next two months, in order to provide consumers the benefits to which they are entitled.

4.      It is feasible for regulators and issuers to take these actions. Marketplace actors have made changes on far more aggressive timelines in the past, most notably in October 2017 in response to federal policy changes that resulted in the loss of $7 billion in federal payments just three weeks before the start of Open Enrollment.

5.      Consumers will be harmed with higher out-of-pocket spending – some with higher deductibles and cost-sharing and others with higher premiums – if these changes are not made.

**Although Changes Related to Cost-Sharing Reductions in October 2017 Were a Major Disruption, Issuers Could and Did Quickly Adapt to Those Changes**

6.      On October 12, 2017, the federal government announced that it would no longer make Cost-Sharing Reduction (CSR) payments to issuers.[1]  This was a major disruption to Marketplace operations that cut payments to Marketplace health plans by $7 billion.[2]  The change was made *after* that year's September 27 deadline for issuers to finalize premiums and sign contracts for Marketplace participation for the following year.[3]

7.      At the time, this change was understood to be a very significant disruption to Marketplace operations and issuers on a timeline that posed threats to the market. Observers said

---

[1] U.S. Dep't of Health & Hum. Servs., Memorandum on Discontinuance of Cost-Sharing Reduction Payments (Oct. 12, 2017), https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

[2] Alison Kodjak, Halt in Subsidies for Health Insurers Expected to Drive Up Costs for Middle Class, NPR (Oct. 13, 2017), https://www.npr.org/sections/health-shots/2017/10/13/557541856/halt-in-subsidies-for-health-insurers-expected-to-drive-up-costs-for-middle-clas.

[3] Rabah Kamal, Ashley Semanskee, Michelle Long, Gary Claxton & Larry Levitt, How the Loss of Cost-Sharing Subsidy Payments Is Affecting 2018 Premiums, KFF (Oct. 27, 2017), https://www.kff.org/private-insurance/issue-brief/how-the-loss-of-cost-sharing-subsidy-payments-is-affecting-2018-premiums/

it was a "a dramatic move"[4] or an "Obamacare bombshell"[5] that would "roil individual markets."[6] President Trump wrote the next day that "Obamacare is imploding" in association with the change.[7]

8.  However, in the days immediately after the October announcement, issuers, the Centers for Medicare & Medicaid Services (CMS), and states worked together to quickly update issuers' individual market filings to react to the change. Issuers generally needed to adopt revised premiums for their plan offerings using novel pricing strategies that differed in important ways from any they had used in the past. CMS and states provided flexibility to allow changes that otherwise were not contemplated under the Marketplace timeline, and by the end of October issuers had made the necessary changes.[8] Open Enrollment began on time on November 1, 2017, nineteen days after the federal government's announcement.

9.  Prior to the October 12 announcement, there were widespread rumors that the federal government could take this step, and so most insurance companies likely engaged in some degree of contingency planning to prepare.

10.  Facilitating Marketplace premium updates in the days after October 12, 2017 was undoubtedly a complex undertaking that required careful work by dedicated staff at CMS, state-based Marketplaces, state insurance regulators, and issuers. The staff undertook those efforts to

---

[4] Kevin Liptak, Tami Luhby & Phil Mattingly, CNN, Trump Will End Health Care Cost-Sharing Subsidies (Oct. 12, 2017), https://www.cnn.com/2017/10/12/politics/obamacare-subsidies
[5] Dan Mangan, Obamacare Bombshell: Trump Kills Key Payments to Health Insurers, CNBC (Oct. 12, 2017), https://www.cnbc.com/2017/10/12/obamacare-bombshell-trump-kills-key-payments-to-health-insurers.html
[6] Timothy Jost, Administration's Ending of Cost-Sharing Reduction Payments Likely to Roil Individual Markets, Health Affairs Forefront (Oct. 13, 2017), https://www.healthaffairs.org/do/10.1377/forefront.20171022.459832/
[7] Kevin Liptak, Tami Luhby and Phil Mattingly, CNN, Trump Will End Health Care Cost-Sharing Subsidies (Oct. 12, 2017), https://www.cnn.com/2017/10/12/politics/obamacare-subsidies
[8] Rabah Kamal, Ashley Semanskee, Michelle Long, Gary Claxton & Larry Levitt, How the Loss of Cost-Sharing Subsidy Payments Is Affecting 2018 Premiums, KFF (Oct. 27, 2017), https://www.kff.org/private-insurance/issue-brief/how-the-loss-of-cost-sharing-subsidy-payments-is-affecting-2018-premiums/

support the successful functioning of the Marketplaces in the wake of a last-minute policy change made by the federal government.

11.    I am not aware of any issuers that dropped out of the Marketplace as a result of the events in October 2017. Every county was served by at least one Marketplace issuer in 2018, as has been the case every year of Marketplace operations.

12.    This experience that CMS, states, and issuers had in implementing novel pricing strategies shortly before the open enrollment period at the end of 2017 demonstrates that it will be feasible for these actors to implement the District Court's order before open enrollment begins this year. The task that these actors were faced with in 2017 was undertaken over a much shorter time period than the task that these actors now face in conforming plan offerings to the version of the CMS rule governing permissible actuarial value ranges that was in place before June 2025.

**It Is Feasible For Plans To Adapt to Changes to the *De Minimis* Range**

13.    To respond to the District Court's ruling, some issuers will be required to change the deductibles and cost-sharing for some of the plans that they will offer on the Exchanges, and to update the premiums for these plans in association with the change.

14.    The result of these changes by issuers will be to make health care more affordable for consumers.

- Consumers receiving advance premium tax credits (APTC) and purchasing benchmark silver plan coverage will pay the same premium for more generous coverage.

- Consumers receiving APTC and purchasing coverage other than the benchmark silver plan will generally pay lower premiums for the same coverage or the same premium for more generous coverage, or some combination.

- The small share of consumers not receiving APTC will generally pay slightly higher premiums for more generous coverage.

These impacts are described in more detail in the following section.

15.    Changing deductibles, cost-sharing, and premiums to be consistent with more narrow *de minimis* ranges requires issuers to use straightforward plan design tools. While the timeline will be different and more compressed than usual, issuers will not need to develop any novel designs or work with any new types of tools to achieve the changes.

16.    It is critical to note that not all plans will require changes: issuers will only be required to change plans with actuarial values outside the *de minimis* ranges that are permissible under the District Court's ruling. CMS possesses data from issuers on the share of plans filed for 2026 that fall outside the permissible ranges but those data are not publicly available. However, one can use data from 2022 to understand the likely scope. Specifically, CMS rules applicable to the 2022 plan year allowed *de minimis* ranges as wide as those the agency attempted to allow for 2026. In 2022, <u>only about one quarter</u> of plans had actuarial values that were outside the ranges that are allowed under the District Court's ruling.[9]  While issuers may have behaved somewhat differently for 2026 than they did in 2022, these data support the reasonable inference that the share of filed plans for 2026 that will require changes is likely to be around one quarter.

17.    There is reason to think that the share of plans that will require changes for 2026 could be considerably smaller than the share that fell outside the more narrow *de minimis* ranges in 2022. That is because, unlike in 2022, issuers in the federally-facilitated Marketplace are now required to offer standardized plans (i.e. plans with cost-sharing designs specified by CMS, and

---

[9] Email from Jason Levitis & Claire O'Brien to Christen Linke Young (Sep. 11, 2025) (on file with author) (citing Marketplace Public Use Files for 2022, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/marketplace/resources/data/public-use-files).

those designs were finalized in 2024 and not changed by the 2025 rulemaking) and are limited in the number of non-standardized plans that they can offer. Only non-standardized plans can fall outside the more narrow *de minimis* ranges. Thus, the plans even potentially affected by the District Court's ruling constitute a limited slice of Marketplace offerings.

18.     CMS first published a final Marketplace rule for 2026 coverage in January 2025, which made no changes to the then-existing rules governing *de minimis* ranges for actuarial value calculations.[10] The publication of that rule kicked off the plan design period for most issuers, and issuers likely began designing plans based on more narrow *de minimis* ranges that had been in effect since the 2023 plan year. In March 2025, CMS proposed wider ranges in its Notice of Proposed Rulemaking,[11] and the rule was finalized at the end of June.[12]  Issuers in many states were required to begin filing proposed individual market fillings with their state insurance regulators prior to the publication of the final rule. Thus, issuers would have gone through the early plan design period with the expectation that the pre-existing rules governing *de minimis* ranges would govern their plan offerings, and would have continued through the plan design period in recognition that there was significant uncertainty about what *de minimis* ranges would apply. The proposed and then final rules were immediately controversial and litigation commenced quickly after finalization, thus reinforcing for issuers that there was continuing uncertainty about the rules that would govern Marketplaces in 2026. Given this significant and extended period of uncertainty, I expect issuers will have engaged in some degree of contingency

---

[10] Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2026; and Basic Health Program, 90 Fed. Reg. 4424 (Jan. 15, 2025).

[11] Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 12,942 (Mar. 19, 2025) (proposed rule).

[12] Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (final rule).

planning, which will likely facilitate the changes necessary to return to more narrow *de minimis* ranges.

19.    Indeed, in the spring of 2025, CMS was encouraging issuers to engage in contingency planning for possible changes that Congress could -- or could not --  make that would affect Marketplace plans. In early May, CMS told plans "to be prepared to react to Congressional action that could affect PY 2026 individual market premiums."[13] Notably, legislation that passed the House (but not the Senate) a few weeks after this memorandum included changes to permissible actuarial value *de minimis* ranges consistent with the CMS proposed (and then final) rule.[14]  That is, CMS has since May advised plans to be prepared for possible changes in these areas.

20.    In my view, CMS, states, and issuers will be able to work together over the next two months to achieve these changes. There is at most a minimal risk that issuers would be unable to conform their plan offerings to the actuarial value rule that was in place prior to June of this year, or that issuers would drop out of the Marketplace. I am not aware of any issuer that has indicated it would leave the Marketplace in association with these changes; issuers generally publicize these actions as far in advance as possible to avoid surprising customers and regulators, so one would expect issuers to have made any such plans public by now.

**Allowing Wider *De Minimis* Ranges To Continue Would Harm Consumers**

21.    As noted above, to respond to the District Court's ruling, some issuers will be required to change the deductibles and cost-sharing for some of the plans that they will offer on the Exchanges, and to update the premiums for these plans in association with the changes.

---

[13] Ctrs. for Medicare & Medicaid Servs., Plan Year 2026 Individual Market Rate Filing Instructions (May 2, 2025), https://www.cms.gov/files/document/py-26-individual-market-rate-filing-instructions.pdf
[14] H.R. 1, 119th Cong. § 44201(c) (as passed by House, May 22, 2025).

22.    The result of these changes will be to make health care more affordable for consumers in a wide range of common scenarios.

23.    Consumers receiving APTC and purchasing benchmark silver plan coverage will pay the same premium for more generous coverage. That's because the APTC amount changes dollar-for-dollar with changes to the benchmark silver premium. If the benchmark plan is changed to have a higher actuarial value (and thus typically to have a higher premium), APTC recipients enrolled in it will get more generous coverage for the same price.

24.    Consumers receiving APTC and purchasing coverage other than the benchmark silver plan will generally pay lower premiums for the same coverage or the same premium for more generous coverage, or some combination.

25.    Specifically, consumers receiving APTC and intending to purchase coverage that is not affected by the District Court's order will generally pay a lower premium for that coverage. That's because, as explained above, the APTC amount changes dollar for dollar with the benchmark silver premium. So, if the benchmark premium increases while the consumer's plan's premium remains unchanged, the consumer's *net premium* will fall. Moreover, because the benchmark premium is the second-lowest-cost silver plan available, it typically has an actuarial value at the low end of the permissible range.

26.    Consumers receiving APTC who would have otherwise purchased coverage that is affected by the District Court's order will generally have a choice between paying about the same net premium for more generous coverage that they would have otherwise received, or using their greater purchasing power on a different plan. Whatever they decide, the larger APTC means a better deal on their coverage.

27.    The small share of consumers not receiving APTC may or may not be affected by the ruling. Those intending to purchase coverage not affected by the District Court's ruling will not generally be affected. Those who would have otherwise purchased coverage that is changed due to the District Court's ruling will generally pay slightly higher premiums for more generous coverage. Since all plans must have actuarially justified rates, the consumer would not generally receive a worse deal under this scenario.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 1, 2025

Christen Linke Young
Washington, D.C.