No. 25-2012

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CITY OF COLUMBUS, *et al.*,

                Plaintiffs-Appellants,

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services, et al.*,

                Defendants-Appellees.

On Appeal from the United States District Court
for the District of Maryland

## REPLY IN SUPPORT OF
## EMERGENCY MOTION FOR STAY PENDING APPEAL

*Of Counsel:*

ROBERT F. FOSTER
   *Acting General Counsel*

ELIZABETH C. KELLEY
   *Acting Deputy General Counsel*

JOCELYN S. BEER
   *Acting Deputy Associate*
     *General Counsel for Litigation*

JILL BRADLEY
GARRETT F. MANNCHEN
   *Attorneys*

   *U.S. Department of Health and*
     *Human Services*

BRETT A. SHUMATE
   *Assistant Attorney General*

KELLY HAYES
   *United States Attorney*

ERIC D. MCARTHUR
   *Deputy Assistant*
     *Attorney General*

CHARLES W. SCARBOROUGH
MAXWELL A. BALDI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7513*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 532-0211*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT .................................................................................................. 3

I.  The district court's order still leaves significant uncertainty in the availability of insurance plans when open enrollment begins on November 1. ................................................................................. 3

II. The government is likely to succeed on the merits. ................................. 7

    A. Plaintiffs' standing arguments underscore the speculative nature of their asserted injuries. ........................................................ 7

    B. HHS lawfully expanded the permissible range for actuarial values. ........................................................................................... 10

CONCLUSION ............................................................................................ 13

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs do not contest that the district court's order will force issuers to completely overhaul many of their insurance plans or that it will require States and the Department of Health and Human Services (HHS) to review and approve these changes on an incredibly compressed timeline. That process injects chaos into the Exchanges in the lead up to open enrollment. And that chaos itself constitutes irreparable harm, regardless of whether every single issuer manages to comply with the narrower actuarial value de minimis ranges under the district court's order in time for its plans to be made available on November 1. As both HHS and the health insurance industry have explained, however, there is good reason to doubt that all issuers will meet their deadlines. The district court's order, therefore, risks significant harm to consumers when they go to buy insurance for next year.

Plaintiffs' attempts to bolster their standing arguments only underscore how much they rely on guesswork and unpredictable future choices third parties may make. Plaintiffs' speculation does not amount to the clear showing of injury necessary to obtain preliminary relief. And on the merits, plaintiffs abandon the statutory argument they had convinced the district court to adopt. They now attack their own argument as a "straw

man," Resp. 16, and acknowledge that in setting the de minimis range HHS may consider many factors in addition to differences in actuarial estimates. Plaintiffs attempt to salvage their claim by reading the statutory obligation to consider "differences in actuarial estimates" to be practically meaningless. Given a natural reading, however, the statute confirms that HHS satisfied its obligation when it explained that it was broadening the de minimis ranges to offer issuers more flexibility in designing plans to meet consumer needs.

Since filing its stay motion, HHS has issued guidance to issuers and States about how to refile and review necessary documents to offer plans reflecting the allowable de minimis ranges under the district court's order. Center for Consumer Information & Insurance Oversight, *Qualified Health Plan Certification Updates* (Sept. 5, 2025), https://perma.cc/WY7T-LY7K (Notice). HHS has instructed issuers to submit updated plan documents, but for the moment it still maintains the ability to give effect to issuers' prior submissions. After September 19, however, "to avoid confusion and ensure an orderly open enrollment period" HHS "do[es] not anticipate allowing issuers to revert to [their originally submitted] de minimis actuarial value ranges." *Id.* at 4. Therefore, the government respectfully requests that this Court resolve this motion no later than **September 19**.

2

# ARGUMENT

**I.   The district court's order still leaves significant uncertainty in the availability of insurance plans when open enrollment begins on November 1.**

1. HHS had to issue guidance to States and issuers on September 5 to ensure issuers have a chance of revising their affected plans to comply with the district court's order in time for these plans to be approved and posted before open enrollment commences on November 1. Notice 1-9; *see* Add.6. As a result, some of the harms of the district court's order can no longer be avoided. Issuers must scramble to begin to revise their plans; consumer confusion still may ensue. But if the Court grants a stay by September 19, that relief will avoid the risk of consumers having fewer plans to choose from if some subset of issuers fail to submit updated plan documents and obtain State or federal approval before open enrollment begins. *See* Notice 4.

2. Plaintiffs do not contest that issuers will need to revise their affected plans to comply with the district court's order. *See* Supp.Add.24. Nor do they contest that issuers risk being unable to update their plans and obtain approvals in time for open enrollment. *See* Supp.Add.29. Instead, they quibble about how significant the burden on issuers, States, and HHS will be. *See, e.g.*, Supp.Add.27 (suggesting that one-quarter of plans will need

3

to be revised). But HHS is best positioned to understand the scope of the immense undertaking required to facilitate redesign and reapproval of plans weeks before open enrollment commences. Plaintiffs cannot defeat the government's showing of irreparable harm by hypothesizing that some "well-advised" issuers may have made contingency plans or that some issuers may be able to update earlier iterations of their plans. *Cf.* Supp.Add.28-29. Even Plaintiffs do not suggest that all issuers have made such preparations. And even if some issuers' preparations may ameliorate some of the burden, all issuers still must submit revised plans on compressed timelines, which leave no margin for error. Moreover, as the health insurance industry's trade group has confirmed in an amicus brief filed in support of the government's stay motion, even contingency planning is likely to be of little value because the scope of the district court's order beyond the actuarial value policy means that "issuers are unlikely to have plan designs readily available that incorporate" all necessary changes. AHIP Br. 9.

Plaintiffs' core argument—that issuers and the relevant agencies may yet be able to revise and approve plans in time—fails to address the concrete harms the district court's order imposes. Plaintiffs seem to assume that any level of chaos and uncertainty in the Exchanges is acceptable as long as

4

issuers actually succeed in revising and obtaining approval of their plans in time to be posted for the start of open enrollment. Plaintiffs note that in 2017 issuers had to scramble to revise rates for their plans on a short timeline. Supp.Add.25. They presume that because HHS once succeeded in managing a last-minute change, HHS will pull a rabbit out of its hat this time too. *See* Resp. 21. That argument would not be logically sound even if the scope of the changes required in 2017 and the scope of the changes required by the district court's analysis were analogous. But they are not. In addition to revising rates, to comply with the narrower de minimis ranges, issuers will need to revise their benefit structures, plan designs, and all consumer-facing materials. *See* Add.5-7. That is a far more onerous undertaking. And this argument is ultimately irrelevant because the chaos, confusion, and instability resulting from the district court's order itself constitutes irreparable harm.

The amicus brief filed by the health insurance industry's trade group highlights the harms the district court's order will unleash. Because calculating a plan's actuarial value depends on a "complex process of calibrating benefits, cost-sharing … and rates," compliance with the narrower de minimis ranges will require many issuers to "completely

5

redesign affected plans." AHIP Br. 8-9. And issuers have expressed their concern that they "may be unable to meet various state deadlines, … potentially leading to fewer plans available to consumers." *Id.* at 9-10. The industry also warns that last-minute changes risk significant "consumer confusion." *Id.* at 10. All those harms stem from the district court's order.

Plaintiffs also suggest (at 22) that an unrelated policy change undermines the government's case for a stay. They misunderstand the effect of HHS's permitting broader eligibility for catastrophic coverage. This change at most may require some issuers to revise their rates if the risk pool in the individual market shifts. That some issuers may seek to alter premiums for catastrophic plans does not undercut the more extensive harms stemming from the district court's order. As explained, there is a magnitude of difference between just recalculating rates and fully redesigning entire plan structures and all associated documents.

This Court should grant a stay to avoid the chaos associated with significant last-minute changes to Exchange plans.

6

## II. The government is likely to succeed on the merits.

### A. Plaintiffs' standing arguments underscore the speculative nature of their asserted injuries.

1. Plaintiffs have sought to backfill their support for Main Street Alliance's standing with a revised declaration from Brooke Legler. *See* Supp.Add.20-22. This tardy effort falls short. Legler now asserts that she will rely on tax credits next year to subsidize her purchase of a silver plan; she continues to assert that she cannot afford to pay anymore for her medication. Supp.Add.21. But what Legler still fails to establish is that *her* premiums or cost sharing will increase because of the actuarial value policy. She offers no information about what plans are available in her county, the actuarial value of her current plan, or whether her issuer plans to take advantage of the wider de minimis range. And even if Legler ends up with a plan with a lower actuarial value, she has not shown that such a change will harm her. Actuarial values derive from a complex balancing of benefits, premiums, and cost sharing. If Legler's issuer decreases the projected value of her silver plan from 70% to 69%, there could be no effect at all on her total costs. For example, her issuer might achieve that reduction by increasing the copay for a service Legler never uses; if so, her total out-of-pocket expenses would remain the same. And as for Legler's premiums, she has not

7

provided any evidence about the benchmark silver plan in her county, so she has not shown that her net premiums will increase. Legler, therefore, fails to show a certainly impending injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02 (2013).

2. The municipal plaintiffs fare no better. Their chain of causation for their self-inflicted injuries (*see* Mot. 16) is far too attenuated to support standing. The starting point is that CMS has allowed issuers to offer plans with lower actuarial values. From there, the cities allege they will be injured as follows. First, some issuers will offer plans with lower actuarial values in their counties. Second, because of the lower actuarial values, some enrollees will be under- or uninsured. Third, some of those under- and uninsured people will require medical treatment in the municipalities. Fourth, some of them will obtain care from the municipal governments. Fifth, those patients will not have coverage that fully reimburses the cities. And sixth, the patients will not pay the balances they owe. *See* Resp. 12-13.

This speculative chain of causation cannot establish standing. Every single link in plaintiffs' causal chain relies on speculation about what third parties may or may not do. As plaintiffs themselves point out, some issuers will not have taken advantage of the actuarial value policy adopted in the

8

Final Rule. *See* Supp.Add.27-28. Plaintiffs offer no basis to conclude that the plans available in Columbus, Chicago, or Baltimore will differ at all as a result of the policy. They then speculate about how potential enrollees will respond to different plan offerings. But mere statistical probabilities are not enough to establish standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). These flaws alone defeat plaintiffs' theory of standing.

      Plaintiffs' chain of causation is also untenable for other reasons. Even assuming that a person declines to enroll in health insurance because a plan available to him is projected to cover only 77% as opposed to 78% of his expenses and assuming that person has a medical emergency in Chicago, plaintiffs still fail to show that they will bear the costs of that treatment. The uninsured patient could take a taxi to a Cook County-run hospital, imposing no costs at all on the City. He could go to a City-owned hospital, obtain treatment, and pay his bill in cash before being discharged. Or any one of a number of other events could intervene. A chain of reasoning this speculative cannot establish the municipalities' standing to sue. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) (rejecting "chain of causation" that depends on choices of "numerous third parties …who may not even exist in

9

respondents' communities and whose independent decisions may not collectively have a significant effect on" the challenged action).[1]

### B. HHS lawfully expanded the permissible range for actuarial values.

On the merits, plaintiffs decline (at 16-17) to defend the district court's reasoning and the argument they advanced in district court. The district court held that "the agency is … constrained to rely only on factors which Congress has intended it to consider." Add.65 (cleaned up). Accordingly, it accepted plaintiffs' argument that "'the purpose of the standard is set forth in section 18022(d)(3) itself [and] the *only* permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates.'" Add.65 (quoting Pls' Mot. for Stay or PI, Dkt. 11-1, at 27) (alteration in original; emphasis added). As plaintiffs seem now to recognize, such an interpretation of the statute makes no sense.

---

[1] Plaintiffs assert that HHS acknowledged in the Final Rule that cities would bear higher costs. Resp. 12-13 (citing 90 Fed. Reg. 27,074, 27,145, 27,192 (June 25, 2025)). Their citations do not support that argument. Page 27,145 of the Final Rule discusses a provision governing monthly special enrollment periods for certain individuals, and page 27,192 concerns coverage denials for failure to pay premiums for prior coverage. Plaintiffs offer no reason to believe that the effects of these policies will be analogous to the effects of the actuarial value policy.

10

Plaintiffs also miss the mark (at 16) when they assert that the agency failed to consider "differences in actuarial estimates" at all. Plaintiffs apparently interpret that phrase to mean technical differences in how an issuer prepares its actuarial value calculation. But every issuer calculates actuarial value with HHS's actuarial value calculator.[2] *See* 90 Fed. Reg. at 27,174 & n.242; *see also* CMS, Updated Revised Final 2026 Actuarial Value (AV) Calculator Methodology (Sept. 5, 2025), https://perma.cc/JN7J-9VHB (describing methodology). So by plaintiffs' reading, the de minimis variation need not exist at all. *But see Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (rule against superfluity has "special force" where interpretation would negate entire provision of a statute).

A much more reasonable way to interpret "differences in actuarial estimates" is that it allows HHS to consider differences between plans in elements like cost-sharing. As a result, issuers may take advantage of a degree of flexibility to design plans to serve consumers better. And that is exactly the rationale HHS gave when it adopted the wider de minimis

---

[2] All issuers must use the actuarial value calculator developed and made available by HHS for the given benefit year. 45 C.F.R. § 156.135(a). A limited exception is available for issuers whose plan design is not compatible with the calculator. *See id.* § 156.135(b).

11

ranges. *See* 90 Fed. Reg. at 27,176. Plaintiffs wholly fail to engage with this rationale for the rule change. Nothing about that decision was arbitrary or capricious.

Finally, recognizing that they are not free to disagree with the agency's policy judgments, plaintiffs argue (at 18-19) that the actuarial value policy adopted in the Final Rule will leave everyone worse off. But plaintiffs' own expert witness refutes that conclusion; he explained that under the revised actuarial value policy, gross premiums for silver plans will decrease. Add.129. The agency has the discretion to choose that outcome, based on its understanding that lower gross premiums will attract more unsubsidized consumers into the risk pool. As plaintiffs themselves acknowledge, "[i]nsurance market stability requires robust enrollment." Resp. 6. And one way to boost enrollment is to lower unsubsidized premiums. Beyond that policy choice, the agency has discretion to prioritize "promot[ing] competition" by allowing issuers to be more responsive to consumer needs, allowing "greater continuity for consumers," and encouraging issuers to continue participating in the Exchanges. 90 Fed. Reg. at 27,176. HHS need not maximize subsidies over all other concerns.

12

## CONCLUSION

For the foregoing reasons, this Court should stay paragraph 2(f) of the district court's order pending appeal. The government respectfully requests a decision by September 19.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

*Of Counsel:*

ROBERT F. FOSTER
  *Acting General Counsel*

ELIZABETH C. KELLEY
  *Acting Deputy General Counsel*

JOCELYN S. BEER
  *Acting Deputy Associate*
    *General Counsel for Litigation*

JILL BRADLEY
GARRETT F. MANNCHEN
  *Attorneys*

  U.S. Department of Health and
    Human Services

KELLY HAYES
  *United States Attorney*

ERIC D. MCARTHUR
  *Deputy Assistant*
    *Attorney General*

CHARLES W. SCARBOROUGH

 /s/ Maxwell A. Baldi
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-0211*
  *maxwell.baldi@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,591 words. This reply also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

　　　　　　　　　　　　　　　　　　*/s/ Maxwell A. Baldi*
　　　　　　　　　　　　　　　　　　MAXWELL A. BALDI