No. 25-2012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

CITY OF COLUMBUS, *et al.*,
*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the
United States Department of Health and Human Services, et al,*
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the District of Maryland

————————————

**BRIEF FOR APPELLANTS**

————————————

*Of Counsel:*

MICHAEL B. STUART
*General Counsel*

ELIZABETH C. KELLEY
*Deputy General Counsel*

JOCELYN S. BEER
*Acting Deputy Associate
General Counsel for Litigation*

JILL BRADLEY
GARRETT F. MANNCHEN
*Attorneys*

*U.S. Department of Health and
Human Services*

BRETT A. SHUMATE
*Assistant Attorney General*

KELLY O. HAYES
*United States Attorney*

CHARLES W. SCARBOROUGH
MAXWELL A. BALDI
*Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-0211*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES ............................................................. 4

PERTINENT STATUTES AND REGULATIONS ...................................... 4

STATEMENT OF THE CASE ................................................................ 4

      A.    Statutory and Regulatory Background ........................................... 4

      B.    Factual Background and Prior Proceedings ................................. 11

SUMMARY OF ARGUMENT ............................................................... 17

STANDARD OF REVIEW ................................................................... 20

ARGUMENT ..................................................................................... 21

I.    Plaintiffs lack standing ............................................................... 21

      A.    The municipal plaintiffs have not demonstrated standing ........... 22

      B.    Main Street Alliance has not demonstrated standing ................. 25

      C.    Doctors for America has not demonstrated standing ................... 27

II.    The district court erred in finding that plaintiffs had demonstrated a likelihood of success on their challenges to the actuarial-value and failure-to-reconcile policies ....................................... 28

      A.    HHS lawfully expanded the permissible range for actuarial values ........................................................................... 29

B.    HHS lawfully required enrollees to comply with the Reconciliation Requirement to maintain eligibility for advance premium tax credits ............................................................35

C.    Plaintiffs failed to show that the equitable factors weigh in favor of staying these two provisions of the Final Rule. ..............41

CONCLUSION .....................................................................................43

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    <u>**Page(s)**</u>

*Abbott v. Perez,*
    585 U.S. 579 (2018) ........................................................................ 42

*Alabama Power Co. v. Costle,*
    636 F.2d 323 (D.C. Cir. 1979) ...................................................... 29

*Allen v. Wright,*
    468 U.S. 737 (1984) ........................................................................ 24

*American Fed'n of Tchrs. v. Bessent,*
    No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ................................ 42

*American Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ........................................................................ 40

*Appalachian Voices v. State Water Control Bd.,*
    912 F.3d 746 (4th Cir. 2019) ...................................................... 28

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................ 24

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) .................................................... 21

*Cook County v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) ...................................................... 21

*Department of Educ. v. Brown,*
    600 U.S. 551 (2023) ........................................................................ 24

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................................................ 28

*Frank Krasner Enters., Ltd. v. Montgomery County,*
    401 F.3d 230 (4th Cir. 2005) ...................................................... 22

*Friends for Ferrell Parkway, LLC v. Stasko,*
    282 F.3d 315 (4th Cir. 2002) ...................................................... 25

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ..................................................................... 27

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
  78 F.4th 622 (4th Cir. 2023) .................................................... 23

*King v. Burwell,*
  576 U.S. 473 (2015) ....................................................................... 4

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ............................................... 29, 32, 38, 39

*Maryland Shall Issue, Inc. v. Hogan,*
  971 F.3d 199 (4th Cir. 2020) ................................................... 27

*Michigan v. EPA,*
  576 U.S. 743 (2015) ............................................................... 31, 33

*Murthy v. Missouri,*
  603 U.S. 43 (2024) .................................................................. 22, 26

*National TPS All. v. Noem,*
  150 F.4th 1000 (9th Cir. 2025) ......................................... 20-21, 21

*Navy Fed. Credit Union v. LTD Fin. Servs., LP,*
  972 F.3d 344 (4th Cir. 2020) ................................................... 40

*NLRB v. SW Gen., Inc.,*
  580 U.S. 288 (2017) ..................................................................... 40

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ..................................................................... 25

*Scotts Co. v. United Indus. Corp.,*
  315 F.3d 264 (4th Cir. 2002) ................................................... 41

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ................................................................ 32, 38

*Spencer v. Kemna,*
  523 U.S. 1 (1998) ......................................................................... 24

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ..................................................................... 23

iv

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ................................................................ 21, 22

*United States v. Texas,*
 599 U.S. 670 (2023) ...................................................................... 25

*Winter v. Natural Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ........................................................................... 21

**Statutes:**

Administrative Procedure Act (APA),
 5 U.S.C. § 705 ........................................................................... 3, 21

Patient Protection and Affordable Care Act (ACA):
 42 U.S.C. § 300gg-1(a) ................................................................... 4
 42 U.S.C. § 300gg-2(a) ................................................................... 5
 42 U.S.C. § 300gg-2(b)(1) ............................................................... 5
 42 U.S.C. § 18021(a)(1)(B) ............................................................. 6
 42 U.S.C. § 18022(a) ...................................................................... 6
 42 U.S.C. § 18022(d) ...................................................................... 6
 42 U.S.C. § 18022(d)(2) .................................................................. 6
 42 U.S.C. § 18022(d)(3) ............................................. 1, 6, 19, 29, 31
 42 U.S.C. § 18031(c)(6) ................................................................... 5
 42 U.S.C. § 18031(d) ...................................................................... 5
 42 U.S.C. § 18041(a) ..................................................................... 15
 42 U.S.C. § 18041(a)(1) ....................................................... 5, 36, 37
 42 U.S.C. § 18041(b) ...................................................................... 5
 42 U.S.C. § 18041(c)(1) ................................................................... 5
 42 U.S.C. § 18081-18082 ............................................................... 36
 42 U.S.C. § 18081(a) ...................................................................... 9
 42 U.S.C. § 18081(a)(2) ................................................................. 39
 42 U.S.C. § 18082 .......................................................................... 8
 42 U.S.C. § 18082(b)(2)(B) ........................................................... 36

Pub. L. No. 119-21, 139 Stat. 72 (2025)......................................9

26 U.S.C. § 36B ............................................................................. 8

26 U.S.C. § 36B(b)(2)-(3) ........................................................ 8, 38, 39

26 U.S.C. § 36B(b)(3)(A)(i) ................................................................ 34

26 U.S.C. § 36B(b)(3)(A)(iii) ............................................................ 34

26 U.S.C. § 36B(d) ............................................................................ 39

26 U.S.C. § 36B(e) ............................................................................ 39

26 U.S.C. § 36B(f) ............................................................................ 24

26 U.S.C. § 36B(f)(1) ........................................................ 8, 27, 36, 37

26 U.S.C. § 36B(f)(2) .......................................................................... 9

26 U.S.C. § 36B(h) ............................................................................ 39

28 U.S.C. § 1292(a)(1) ........................................................................ 3

28 U.S.C. § 1331 ................................................................................. 3

49 U.S.C. § 32902(a) ........................................................................ 29

## Regulations:

26 C.F.R. § 1.36B-4(a)(1)(i) ................................... 8, 9, 24, 27, 36, 37

26 C.F.R. § 1.6011-8 ............................................................. 10, 24, 27

26 C.F.R. § 1.6011-8(a) ....................................................................... 9

45 C.F.R. § 155.305(f)(4) ................................................................... 11

## Rule:

Fed. R. App. P. 4(a)(1)(B) ................................................................... 3

**Other Authorities:**

Ctrs. for Medicare & Medicaid Servs., HHS, *Failure to File and Reconcile (FTR) Operations Frequently Asked Questions (FAQ)* (Apr. 19, 2024), https://perma.cc/K3LK-A778 ................................... 10

76 Fed. Reg. 51,202 (Aug. 17, 2011) ...................................................... 10

77 Fed. Reg. 18,310 (Mar. 27, 2012) .......................................... 10, 36, 37

77 Fed. Reg. 30,377 (May 23, 2012) ....................................................... 10

78 Fed. Reg. 12,834 (Feb. 25, 2013) ........................................... 6, 7, 32

81 Fed. Reg. 94,058 (Dec. 22, 2016) ............................................... 6, 7

82 Fed. Reg. 18,346 (Apr. 18, 2017) ............................................... 7, 32

87 Fed. Reg. 27,208 (May 6, 2022) ................................................ 7, 32

88 Fed. Reg. 25,740 (Apr. 27, 2023) ........................................... 10, 36

90 Fed. Reg. 12,942 (Mar. 19, 2025) .............................. 11, 12, 14, 15, 30, 36, 42

90 Fed. Reg. 27,074 (June 25, 2025) .................... 1, 13, 14, 15, 18, 30, 35, 36, 41

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................. 40

## INTRODUCTION

The Affordable Care Act (ACA) established health insurance Exchanges, which allow millions of Americans to purchase individual coverage every year. This litigation concerns several technical changes the Department of Health and Human Services (HHS) made to the rules for consumers to access and for issuers to offer coverage through the Exchanges. *See* 90 Fed. Reg. 27,074 (June 25, 2025) (Final Rule). At issue in this appeal are two of those changes.

First, issuers offer plans on the Exchanges at various "metal tiers," from bronze to platinum, reflecting an estimate of the average percentage of healthcare expenses the plan will cover. This percentage is known as the plan's "actuarial value." The ACA authorizes HHS to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan." 42 U.S.C. § 18022(d)(3). Previously, the lower bound for variation was between 0% and 2% below the target level for each tier. In its Final Rule, HHS allowed all plans to vary by as much as 4% below the target. The district court held that this decision was likely arbitrary and capricious and stayed the effective date of the actuarial-value policy.

Second, the ACA provides means-tested subsidies to Exchange enrollees in the form of tax credits to help them afford premiums and cost sharing. Enrollees ordinarily may receive these credits either in advance of the plan year based on their projected income for that year or in arrears when they file their tax returns. Those who receive tax credits based on projected income are obligated annually to reconcile their actual eligibility for subsidies against the advance credits they received on their federal income tax returns. From 2015 to 2023, enrollees became ineligible to receive tax credits in advance if they failed to meet this Reconciliation Requirement in a prior year. In 2023, HHS amended the regulation to deny enrollees advance premium tax credits only if they failed to meet the reconciliation requirement in two consecutive years. In the 2025 Final Rule, HHS reverted back to the longstanding one-year failure-to-file-and-reconcile policy. The district court held that HHS lacked statutory authority to deny any enrollees eligibility for advance premium tax credits and stayed the effective date of the failure-to-file-and-reconcile policy.

The district court erred in granting preliminary relief on both accounts. HHS has statutory authority to provide for a de minimis range of variation in actuarial values, and it properly exercised that authority here,

2

explaining why it believed a broader range would benefit consumers in the
long run. The district court was not free to second guess the policy judgment
embodied in the actuarial-value policy. As for the failure-to-file-and-reconcile
policy, the ACA broadly empowers HHS to fill in the details of the advance
premium tax credit scheme. HHS validly used that power to modify a
policy—in effect for over a decade now—tying eligibility for advance
premium tax credits to meeting the Reconciliation Requirement.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C.
§ 1331. JA11. On August 22, 2025, the district court entered an order under
5 U.S.C. § 705 staying the effective dates of six provisions of the Final Rule,
JA180-181, and on August 25, 2025, the district court amended and clarified
that order, JA182-183. The government filed a timely notice of appeal on
August 28, 2025. JA184; *see* Fed. R. App. P. 4(a)(1)(B). This Court has
jurisdiction under 28 U.S.C. § 1292(a)(1).

3

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have standing to challenge the actuarial-value policy and the failure-to-file-and-reconcile policy.

2. Whether the district court abused its discretion in staying implementation of the actuarial-value policy.

3. Whether the district court abused its discretion in staying implementation of the failure-to-file-and-reconcile policy.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015). To "ensure that anyone can buy insurance," *id.* at 493, the ACA generally prohibits health insurance issuers in the individual or group markets from denying coverage to applicants because of their health, 42 U.S.C. § 300gg-1(a). And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled

customer's coverage "at the option of … the individual," provided they pay their premiums. *Id.* § 300gg-2(a), (b)(1).

Among its many provisions, the ACA provides for the creation of "Exchanges," which are State-specific marketplaces where consumers can compare and purchase private health insurance. 42 U.S.C. § 18031(d). Some Exchanges are operated by individual States. *Id.* § 18041(b). Other Exchanges are operated by the federal government within the States. *Id.* § 18041(c)(1). In each State, individuals typically can enroll in health insurance plans through the state Exchange for the upcoming plan year during an annual "open enrollment period," or for the current plan year during "special enrollment periods" that become available if a certain triggering event occurs (*e.g.*, a person loses employer-based coverage). *Id.* § 18031(c)(6).

The HHS Secretary has broad authority under the ACA to issue regulations implementing and "setting standards for" the ACA's requirements, including regulations regarding the "establishment and operation of Exchanges," the "offering of qualified health plans through such Exchanges," and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1).

1. Under the ACA, all health insurance plans must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. §§ 18021(a)(1)(B), 18022(a). These plans are categorized into different "metal tiers" (bronze, silver, gold, and platinum) based on their "level of coverage"; "gold plans," for instance, must have an actuarial value of 80%—*i.e.*, the plan is designed such that the issuer will pay, on average, 80% of covered medical expenses, and the enrollee will pay the remaining expenses through out-of-pocket spending, *id.* § 18022(d). Generally, higher actuarial value correlates with higher premiums and lower actuarial value correlates with lower premiums.

Actuarial values are calculated under regulations issued by HHS. *See* 42 U.S.C. § 18022(d)(2). The statute also instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). HHS initially allowed all plans to vary from the target actuarial value by up to 2% in either direction. 78 Fed. Reg. 12,834, 12,868 (Feb. 25, 2013). In a 2016 regulation, HHS allowed certain bronze plans to vary by between 5% above or 2% below the target. 81 Fed. Reg. 94,058, 94,181 (Dec. 22, 2016). In 2017, HHS expanded the

range to allow most plans to deviate by 2% above or 4% below the target and permitted certain bronze plans to deviate by 5% above or 4% below the target. 82 Fed. Reg. 18,346, 18,368, 18,382 (Apr. 18, 2017). It made this change to "provid[e] issuers increased [actuarial value] flexibility to improve the health and competitiveness of the markets." *Id.* at 18,369. Finally, starting in 2023, HHS narrowed the de minimis range for most plans. 87 Fed. Reg. 27,208 (May 6, 2022). For most plans the range was set to 2% above or below the target; some bronze plans were allowed to vary by between 5% above or 2% below the target; and some silver plans were allowed to vary only by up to 2% above the target. *Id.* at 27,391. The agency made this change because it believed it would allow consumers to more meaningfully compare plans in different tiers. *Id.* at 27,306-07. None of these prior changes were challenged in court. In each prior iteration of this policy, HHS expressly weighed factors like plan design and issuer flexibility. *See* 78 Fed. Reg. at 12,851; 81 Fed. Reg. at 94,142-43; 82 Fed. Reg. at 18,369-71; 87 Fed. Reg. at 27,305-10. And HHS has long rejected the position that "the de minimis range is to account for differences in actuarial estimates only." 82 Fed. Reg. at 18,369.

2. To help make insurance more affordable, the ACA provides subsidies to eligible Exchange enrollees in the form of premium tax credits. *See* 26 U.S.C. § 36B. The availability and amount of these subsidies turns on an enrollee's income for the taxable year. *Id.* § 36B(b)(2)-(3) (providing for subsidies based on annual household income and monthly premium cost of a "benchmark" silver plan on the relevant Exchange). Enrollees can get the benefit of their premium tax credit when they file their annual federal income-tax returns, but they also have the option of receiving premium tax credits in advance and paid directly to their insurance providers to offset premium costs, *see* 42 U.S.C. § 18082.

Because advanced premium tax credits are based on an enrollee's projected annual household income, however, recipients must file a federal income tax return and "reconcile" the advanced premium tax credits they received with the tax credit they ultimately qualify for based on their actual income during the applicable tax year. *See* 26 U.S.C. § 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). Section 36B address "the "[r]econciliation of credit and advance credit," and requires that "[t]he amount of the credit allowed under [Section 36B] for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit." 26 U.S.C. § 36B(f)(1). To

implement that requirement, since 2015 the Secretary of the Treasury has required that any taxpayer who receives "advance payments" must "file an income tax return for that taxable year," 26 C.F.R. § 1.6011-8(a), and "must reconcile the amount of credit allowed under section 36B with advance credit payments on the taxpayer's income tax return for a taxable year," 26 C.F.R. § 1.36B-4(a)(1)(i).[1] We refer to this obligation to file tax returns and reconcile as the "Reconciliation Requirement." An enrollee who receives more advance premium tax credits than he is ultimately eligible for is required to repay the excess amount to the Treasury though his taxes. 26 U.S.C. § 36B(f)(2). At the time the Final Rule was promulgated, the ACA capped the amount of this repayment obligation, *see id.*, but Congress has since eliminated that cap effective from January 1, 2026, *see* Pub. L. No. 119-21, § 71305, 139 Stat. 72, 324-25 (2025).

The ACA directs HHS to "establish a program … for determining" whether individuals claiming premium tax credits meet the applicable income and other eligibility requirements. 42 U.S.C. § 18081(a). Starting in 2015, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" advance premium tax credits if (1) the filer received advance premium tax

---

[1] Plaintiffs do not challenge the validity of these regulations.

9

credits the prior year and (2) the filer (or the filer's spouse) failed to comply with the Reconciliation Requirement for that year.[2] 77 Fed. Reg. 18,310, 18,453 (Mar. 27, 2012); *see also* 77 Fed. Reg. 30,377, 30,394 (May 23, 2012).[3] In implementing this regulation, HHS explained that it was meant to facilitate compliance "with the requirement to file a tax return" in 26 C.F.R. § 1.6011-8. 76 Fed. Reg. 51, 202, 51,208 (Aug. 17, 2011). The rule was "intended to prevent a [taxpayer] who has failed to comply with tax filing rules from accumulating additional Federal tax liabilities due to advance payments of the premium tax credit." *Id.* HHS emphasized that "[a]n individual may remove this restriction by filing a tax return for the year in question." *Id.* In 2023, HHS amended the failure-to-file-and-reconcile regulations such that a taxpayer becomes ineligible for advance premium tax credits only after failing to meet the Reconciliation Requirement for two consecutive tax years. *See* 88 Fed. Reg. 25,740, 25,918 (Apr. 27, 2023).

---

[2] Due to the COVID-19 pandemic's impact on "the processing of federal income tax returns", HHS "did not act on" data indicating an enrollee had failed to comply with the Reconciliation Requirement in plan years 2021 through 2023. Ctrs. for Medicare & Medicaid Servs., HHS, Failure to File and Reconcile (FTR) Operations Frequently Asked Questions (FAQ) 1 (Apr. 19, 2024), https://perma.cc/K3LK-A778.

[3] These regulations, promulgated in 2012, first took effect in 2015.

Taxpayers who are determined ineligible for advance premium tax credits due to their failure to reconcile can still claim on their tax returns the full amount of the subsidies they are otherwise eligible for, but they cannot receive credits in advance. *See* 45 C.F.R. § 155.305(f)(4).

### B.   Factual Background and Prior Proceedings

1. Last spring, HHS proposed a variety of regulatory changes to the way Exchanges operate. 90 Fed. Reg. 12,942 (Mar. 19, 2025). These proposals aimed to "provide relief from rising health care costs" by "strengthening the integrity of [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." *Id.* at 12,942.

a. One of the proposals was to expand the permissible range of variation for plans' actuarial values. HHS proposed allowing all standard tiers of plans to vary up to 4% below their target levels. 90 Fed. Reg. at 12,995-97.

HHS proposed these expanded ranges because, since the last change in 2023, the agency had "received considerable feedback from issuers that indicates narrower de minimis ranges substantially reduce issuer flexibility in establishing plan cost sharing." 90 Fed. Reg. at 12,996. While HHS acknowledged that plans under the narrower range were easier to compare,

11

issuers were prohibited from designing plans to provide for optimal cost sharing. *Id.* The agency further noted that "issuers have also voiced concern about their ability to continue to participate in the market generally" and explained that "[s]ustained, robust issuer participation in the market is key to ensuring overall market stability and keeping costs down." *Id.* Under the expanded ranges, issuers could choose between issuing plans with higher actuarial values to "attract enrollment" and plans with lower actuarial values to "appeal to wide segments of the population." *Id.*

HHS also acknowledged that expanding the de minimis range would likely cause premium tax credits to decline because they are calculated using a benchmark silver-level plan. 90 Fed. Reg. at 12,996-97. HHS noted that the change could diminish affordability for subsidized consumers, at least in the short term. *Id.* But it also projected that the change would increase affordability for unsubsidized consumers, which in turn would attract this group to expand the risk pool and reduce premiums as a whole. *Id.* at 12,997. HHS thus proposed to reject "a short-sighted approach to regulating the [actuarial value] de minimis ranges" in favor of ensuring that in the long-term "a sufficient choice of affordable plans" remains available. *Id.*

12

After considering more than 26,000 comments on the proposed rule, HHS finalized the actuarial-value policy as proposed. 90 Fed. Reg. at 27,076, 27,176. HHS reiterated that reverting to the wider de minimis range "will significantly improve issuer flexibility in plan design." *Id.* at 27,176. The agency projected three primary benefits from this increased flexibility. First, "these expanded ranges allow issuers to design plans that better promote competition in the market" by offering plans more responsive to consumer needs. *Id.* Second, "the wider ranges provide flexibility for issuers to make adjustments to their plans within the same metal level," resulting in "greater continuity for consumers." *Id.* Third, the "expanded ranges help maintain robust issuer participation" by "reducing compliance burdens." *Id.* The agency noted that this third goal was "particularly important considering that several issuers have publicly announced their intent to end participation in the Exchange in [Plan Year] 2026." *Id.*

HHS again acknowledged that the new actuarial-value policy could reduce the amount of tax credits available to subsidized consumers because they are calculated using a benchmark silver plan. 90 Fed. Reg. at 27,176. But, pointing to its rationale in the notice of proposed rulemaking, the agency explained that it was choosing to prioritize "access and affordability

13

in the long term." *Id.* HHS determined that "this change will better

incentivize unsubsidized enrollees to enroll in coverage, which [it] expect[s]

to lower overall costs and further drive down premiums as the risk pool

improves." *Id.* at 27,177.

b. HHS also proposed to reinstate its prior policy of deeming enrollees

ineligible for advance premium tax credits if they fail to comply with the

Reconciliation Requirement for the prior year. 90 Fed. Reg. at 12,944.

HHS proposed reverting to the one-year failure-to-file-and-reconcile

policy because it was concerned about a "substantial risk of improper

enrollment" for advance premium tax credits and, as a result, a "greater risk

of [enrollees'] accumulating increased tax liabilities." 90 Fed. Reg. at 12,959.

HHS looked to evidence suggesting that some brokers improperly enrolled

in a plan with advance premium tax credits people who had incomes too low

to qualify. *Id.* at 12,960. It indicated that the one-year policy would help it to

detect such improper enrollments because people below the income

threshold for advance premium tax credits are generally below the required

threshold to file federal tax returns. *Id.* HHS also noted that more than half

of those who do comply with the Reconciliation Requirement receive excess

advance premium tax credits and, as a result, are subject to repayment

14

obligations and potentially penalties and interest. *Id.* at 12,960-61. HHS explained that a one-year failure-to-file-and-reconcile policy would limit the amount of those tax liabilities. *Id.* at 12,961.

After considering comments, HHS finalized the one-year failure-to-file-and-reconcile policy through the end of 2026. 90 Fed. Reg. at 27,077, 27,115. In response to comments questioning the agency's authority to promulgate the rule, HHS invoked its "general rulemaking authority under [42 U.S.C. § 18041(a)]" to "facilitate compliance" with filing and reconciliation "requirements." *Id.* at 27,117.

2. Plaintiffs are three municipalities; Main Street Alliance, a group representing small business owners; and Doctors for America, a group of physicians. JA11-12. They sued and sought preliminary relief against nine provisions of the Final Rule. JA32-75. Under § 705 of the Administrative Procedure Act, the district court stayed the effective date of seven of those provisions including the actuarial-value policy and the failure-to-file-and-reconcile policy. JA182-123.

The district court first concluded that at least the municipalities and Main Street Alliance have Article III standing. JA114-127. As relevant here, the district court then concluded that the actuarial-value policy was likely

arbitrary and capricious for two reasons. JA138-142. First, the district court concluded that HHS relied on factors other than those Congress had intended because HHS did not justify the de minimis range it selected based solely on "uncertainties in differences in actuarial estimates." JA140. (quotation marks omitted). Second, the district court concluded that the agency's reasoning for why the actuarial-value policy would have long-term benefits was "conclusory and unsupported by evidence." JA141. Specifically, the district court faulted the agency for referring to a "'short-term' trade off" without "data to back up the claim and reasoning that coverage would become 'more affordable' over time." JA141.

The district court also determined that HHS unlawfully adopted the failure-to-file-and-reconcile policy. JA149-154. The district court concluded that plaintiffs' challenge was timely, JA152-153, and then concluded that HHS lacks statutory authority to "condition [advance premium tax credit] eligibility on reconciling tax information," JA153.

Having concluded that plaintiffs had demonstrated a likelihood of success on the merits of their claims, the district court then concluded that the balance of the equities favored plaintiffs, relying primarily on the "strong public interest in Americans maintaining affordable healthcare coverage."

JA174. Accordingly, the district court universally stayed the effective date of the actuarial-value policy and the failure-to-file-and-reconcile policy. JA175-178; *see also* JA183 (staying implementation date of "changes to the de minimis ranges for actuarial value calculations").[4]

3. The government appealed and sought a stay pending appeal, which this Court denied without explanation. Order (Sep. 18, 2025).

## SUMMARY OF ARGUMENT

I. None of the plaintiffs has established an Article III injury permitting them to challenge the actuarial-value policy or the failure-to-file-and-reconcile policy. The municipal plaintiffs' standing is based on their assertion that the policies will cause their residents to lose coverage, pushing uncompensated expenses on to their budgets. For the actuarial-value policy, that theory of injury improperly requires a chain of speculation about how third parties will act; for the failure-to-file-and-reconcile policy, it has no support at all. The municipalities also rely on self-inflicted injuries, which do not suffice for purposes of Article III.

---

[4] The district court issued an initial order on August 22, 2025, JA180-181, and subsequently issued a corrected order on August 25, 2025, JA182-183. The August 25 order is the operative order. In this interlocutory appeal, the government does not challenge the district court's order with respect to the five other stayed policies.

17

The organizational plaintiffs' attempts to establish their standing fare no better. Main Street Alliance relies exclusively on a single member who has not established that either policy will cause her health insurance costs to rise. And Doctors for America relies solely on asserted harms to third parties, which are insufficient to establish their standing to challenge either of the policies at issue here.

II. Even assuming plaintiffs have standing, the district court abused its discretion in staying implementation of these two policies.

A. HHS reasonably exercised its discretion in setting the actuarial-value policy. The agency acknowledged that its decision involved trade-offs but concluded that a broader de minimis range was worth the costs because it would "promote competition" by allowing issuers to be more responsive to consumer needs, allow "greater continuity for consumers," and encourage issuers to continue participating in the Exchanges. 90 Fed. Reg. at 27,176.

The district court erred in staying the actuarial-value policy because the court construed HHS's statutory authority too narrowly and misunderstood the record before the agency. The district court understood Congress's instruction to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage

18

of a plan to account for differences in actuarial estimates," 42 U.S.C.
§ 18022(d)(3), to permit HHS to consider only the technical limits of actuarial
analysis. But HHS was authorized, and indeed had an obligation, to consider
the de minimis range in a more holistic light, taking into account appropriate
policy concerns. At a minimum, HHS was entitled to consider effects like the
overall health of the risk pool and the insurance market when it established
the de minimis range, and the agency had ample record support for its
decisions.

B. HHS also had authority to adopt a failure-to-file-and-reconcile
policy identical to its longstanding previous policy. Congress authorized the
Reconciliation Requirement, requiring those who obtain advance premium
tax credits to file a federal income tax return and "reconcile" the advanced
premium tax credits they received with the tax credit they ultimately qualify
for. And it authorized HHS to issue regulations to effectuate that policy.
Since 2015, HHS has appropriately used that authority to issue failure-to-
file-and-reconcile policies in several different forms, and it properly invoked
that power in issuing the policy challenged here.

19

The district court incorrectly concluded that the ACA prohibits HHS from tying advance premium tax credit eligibility to the Reconciliation Requirement. But the statute neither expressly nor impliedly prohibits such a policy; indeed, HHS previously adopted an identical policy and no one challenged the agency's authority to do so. Congress set out the basic terms of the program, leaving the details to HHS, and HHS has the authority to implement the Reconciliation Requirement by making it a condition of eligibility for advance premium tax credits.

C. Finally, the district court erred in concluding that plaintiffs adequately demonstrated that the balance of equities weighs in favor of a stay of either policy. HHS promulgated the actuarial-value and failure-to-reconcile policies to address real problems in the insurance markets. Weighing the government's efforts to resolve these problems against plaintiffs' speculative harms, this Court should conclude that the balance of the equities favors the government.

## STANDARD OF REVIEW

When reviewing the grant of a § 705 stay, courts review the district court's factual findings for clear error, legal determinations de novo, and ultimate decision to grant relief for abuse of discretion. *See National TPS*

*All. v. Noem*, 150 F.4th 1000, 1015-16 (9th Cir. 2025); *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

Section 705 of the Administrative Procedure Act (APA) authorizes a reviewing court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. To obtain a § 705 stay, a plaintiff must make the same showing as for a preliminary injunction: likelihood of success on the merits, irreparable harm, and that the balance of the equities and public interest favor relief. *See, e.g.*, *National TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs failed to meet that high burden.

## I.     Plaintiffs lack standing

To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A plaintiff must meet this requirement for each claim and

21

each form of relief it seeks. *Id.* at 431. When seeking preliminary relief, it must "make a 'clear showing'" that it is "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). None of the plaintiffs has established standing to challenge the two policies at issue in this appeal.

### A.    The municipal plaintiffs have not demonstrated standing

The municipal plaintiffs claim standing based on their assertion that the Final Rule will cause their residents to lose coverage, which in turn will result in the municipalities' "shouldering the expense of uncompensated care." JA126-127. There are at least two major problems with this theory of standing.

*First*, it relies on an attenuated chain of speculation. When it comes to the actuarial-value policy, the municipalities assume that the policy may cause some people to disenroll from health insurance; that these consumers will require medical care in Chicago, Columbus, or Baltimore; that they will obtain emergency medical transportation or care from the city; and that they will not pay for that care. A party lacks standing when "an independent third party ... st[ands] between the plaintiff and the challenged actions." *Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 235 (4th Cir. 2005).

22

This chain of causation "requires guesswork" about what third parties will do and thus does not suffice to establish standing. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 631 (4th Cir. 2023). Among other things, some issuers did not plan to take advantage of the actuarial-value policy adopted in the Final Rule. Plaintiffs offer no basis to conclude that the plans available in Columbus, Chicago, or Baltimore will differ at all as a result of the policy. They then speculate about how potential enrollees will respond to different plan offerings. But such speculation is not enough to establish standing; indeed, the Supreme Court has held that potential injuries based on statistical probabilities are insufficient to establish standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). These flaws alone defeat plaintiffs' theory of standing.

Plaintiffs' chain of causation is also untenable for other reasons. Even assuming that a person declines to enroll in health insurance because a plan available to him is projected to cover only 77% as opposed to 78% of his expenses, and even assuming that person has a medical emergency in Chicago, plaintiffs still fail to show that they will bear the costs of that treatment. The uninsured patient could take a taxi to a Cook County-run hospital, imposing no costs at all on the City. He could go to a City-owned

hospital, obtain treatment, and pay his bill in cash before being discharged. Or any one of a number of other events could intervene. A chain of reasoning this speculative cannot establish the municipalities' standing to sue. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) (rejecting "chain of causation" that depends on choices of "numerous third parties … who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on" the challenged action).

The standing problem is even more pronounced when it comes to the failure-to-file-and-reconcile provision because individuals who receive advance premium tax credits are obligated to meet the Reconciliation Requirement. *See* 26 U.S.C. § 36B(f); 26 C.F.R. §§ 1.36B-4(a)(1)(i), 1.6011-8. Failure to reconcile is unlawful, and a party may not establish standing by speculating that a third party may act unlawfully. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *cf. Spencer v. Kemna*, 523 U.S. 1, 15 (1998) (no standing to pursue a claim "contingent upon respondents' violating the law" in the future).

*Second*, the municipalities rely on self-inflicted injuries. But it is well-established that the incidental effects of policies do not confer standing. *See, e.g.*, *Department of Educ. v. Brown*, 600 U.S. 551, 568 (2023). If the cities

choose to provide services to their residents, they cannot complain that federal policy causes more residents to seek those services. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 662-64 (1976) (per curiam). As the Supreme Court has explained, a local government's desire to "supply social services such as healthcare," *United States v. Texas*, 599 U.S. 670, 674 (2023), is not a cognizable injury.

**B.     Main Street Alliance has not demonstrated standing**

Main Street Alliance invokes associational standing, which requires it to establish that at least one member could sue in her own right. *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). Main Street Alliance points to a single member, Brooke Legler, who asserts that she relies on insurance purchased through an Exchange to pay for expensive medicines. JA67. Legler further asserts that she runs a small business "on narrow margins," predicts that the Final Rule "will cause [her] health insurance coverage costs to increase to a level that [she] cannot afford," and surmises that these increased costs "will likely make it impossible for [her] to continue [her] business." JA68. These allegations do not establish that the actuarial-value policy causes Legler certainly impending harm.

25

Legler's assertion of injury rests on contingency and conjecture. Main Street Alliance has not offered any details to establish that *Legler's* premiums or cost sharing will increase because of the actuarial-value policy. *See* JA43 n.17 (plaintiffs' expert asserts only that "many" subsidized consumers will face higher net premiums). Plaintiffs offered no information about what plans are available in Legler's county, the actuarial value of her current plan, or whether her issuer would take advantage of the wider de minimis range. And even if Legler ends up with a plan with a lower actuarial value, she has not shown that such a change will harm her. Actuarial values derive from a complex balancing of benefits, premiums, and cost sharing. If Legler's issuer decreases the projected value of her silver plan from 70% to 69%, there could be no effect at all on her total costs. For example, her issuer might achieve that reduction by increasing the copay for a service Legler never uses; if so, her total out-of-pocket expenses would remain the same. And Main Street Alliance has not provided any evidence about the benchmark silver plan in Legler's county, so it has not shown that her net premiums are likely to increase. Main Street Alliance, therefore, fails to "make a 'clear showing,'" *Murthy*, 603 U.S. at 58, that the lone member on

26

which it relies for associational standing will face higher costs, much less to support Legler's forecasted loss of her business.

Nor has Main Street Alliance demonstrated standing to challenge the failure-to-file-and-reconcile policy. Legler is obligated to file a federal tax return, and she is required to reconcile her advance credits when she files. 26 U.S.C. § 36B(f)(1); 26 C.F.R. §§ 1.36B-4(a)(1)(i), 1.6011-8. Because she has no cognizable interest in violating either of these legal obligations and has not said she intends to violate them, she cannot assert any harm from a policy that imposes consequences for such violations. *Cf. Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (plaintiffs may not challenge prohibition on conduct when they "have no intention of engaging in such conduct in the first place").

## C. Doctors for America has not demonstrated standing

Doctors for America's attempt to establish standing relies on an even more attenuated chain of speculation. The organization submitted declarations from two physician members, neither of whom asserts any cognizable injuries to themselves. *See* JA74-75, JA92-93. They mostly rely on asserted injuries to their patients, but they cannot raise claims on behalf of third parties. *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013). Neither

27

physician directly asserts a personal loss of income as a result of the Final Rule, much less as a result of any of the challenged policies. Finally, while one of the physicians asserts that he will need to spend more time counseling his patients about paying for care, *see* JA93, the Supreme Court has decisively rejected diversion-of-resources theories as grounds for standing, *see FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

## II.     The district court erred in finding that plaintiffs had demonstrated a likelihood of success on their challenges to the actuarial-value and failure-to-reconcile policies

Arbitrary and capricious review "is highly deferential, with a presumption in favor of finding the agency action valid." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quotation marks omitted). This is especially true when an agency's decision involves "not just simple findings of fact but complex predictions based on special expertise"—in those cases, "a reviewing court must generally be at its most deferential." *Id.* (quotation marks omitted). In these circumstances, a reviewing court's sole job is to determine "whether the agency considered the relevant factors and whether a clear error of judgment was made," without "substitut[ing] its judgment for that of the agency." *Id.* (quotation marks omitted).

## A.    HHS lawfully expanded the permissible range for actuarial values

1. HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary or capricious. The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The statute necessarily calls for the agency to exercise discretion in how much variation to permit. The phrase "de minimis" implies some play in the joints. *Cf. Alabama Power Co. v. Castle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances ...."). Congress did not, for example, demand that HHS select the "maximum feasible" standard. *Cf.* 49 U.S.C. § 32902(a) (setting such a requirement for fuel economy standards). Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range, thus delegating to the agency the discretion to make reasonable policy judgments in carrying out that duty. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In accounting for "differences in actuarial estimates," therefore, HHS may consider differences in cost-sharing and other components between plans.

29

HHS reasonably exercised its discretion here. HHS explained that it sought to "significantly improve issuer flexibility in plan design." 90 Fed. Reg. at 27,176. The agency predicted that this increase in flexibility would have three key benefits. It would "promote competition" by allowing issuers to be more responsive to consumer needs, allow "greater continuity for consumers," and encourage issuers to continue participating in the Exchanges. *Id.* The agency therefore provided a reasoned explanation for its decision to alter the actuarial-value policy.

HHS also acknowledged that its decision involved trade-offs. The agency recognized that expanding the de minimis range would likely reduce tax credits for subsidized consumers. 90 Fed. Reg. at 27,076. But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers. *See id.* HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable. *See id.*; *see also* 90 Fed. Reg. at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing "short-sighted approach" of focusing only on maximizing subsidies). HHS did not act unreasonably in making that policy choice.

2. In staying the actuarial-value policy, the district court construed HHS's authority under 42 U.S.C. § 18022(d)(3) too narrowly. That provision instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The district court read that provision to permit the agency to consider *only* "differences in actuarial estimates." *See* JA140 (quotation marks omitted). By that logic, HHS would be required to select the narrowest technically feasible range regardless of the consequences. Thus, if HHS concluded that issuers should be able to project their actuarial values within 0.01% of a benchmark plan, it would be required to set that range—even if most issuers fled the Exchanges because of the overly restrictive policy. But if HHS actually tried to implement such a policy and steadfastly refused to consider the resulting loss of coverage, a reviewing court would likely conclude that the agency failed to consider an important aspect of the problem. *Cf. Michigan v. EPA*, 576 U.S. 743, 759 (2015) (holding unreasonable agency's failure to consider costs of regulation). It follows, therefore, that HHS has authority (and indeed an obligation) to consider more than just the technical limits of actuarial analysis when it sets the de minimis range.

31

The agency has consistently understood its statutory obligation in this more holistic light. *See Loper Bright*, 603 U.S. at 388 (consistency in agency interpretation bolsters its "power to persuade" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). Indeed, every time that HHS has set or adjusted the de minimis range, it has looked to factors beyond "differences in actuarial estimates." When HHS set the range initially in 2013, it sought to "strik[e] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics," and sought to "allow[ ] plans to retain the same plan design year to year." 78 Fed. Reg. at 12,851. When the agency subsequently adjusted the range, it also based its reasoning on these factors, 87 Fed. Reg. at 27,307, as well as others such as market competitiveness, 82 Fed. Reg. at 18,369. Under plaintiffs' restrictive reading of the statute, which the district court adopted, all of these prior decisions were unlawful. But none of those prior adjustments was ever challenged, and the district court erred in invalidating HHS's most recent adjustment to the actuarial-value range.

The district court's unprecedented and narrow reading of HHS's authority to establish actuarial ranges ignores the agency's obligation to consider differences in actuarial estimates when it sets the de minimis range.

The court's ruling also has the perverse effect of forcing the agency to ignore critical elements of a problem that Congress gave HHS wide latitude to address. In order to fulfill their obligation to engage in reasoned decision making under the APA, agencies must consider all important parts of the relevant problem. *See Michigan*, 576 U.S. at 750. Setting a permissible range for actuarial values is one element of ensuring access to affordable healthcare—a complex and multifaceted problem with various overlapping elements. Not only was HHS allowed to consider effects like the overall health of the risk pool and the insurance market when it established the de minimis range, it was required to consider those factors. The district court erred in overruling the agency's reasonable policy judgments in setting a new actuarial-value policy.

3. In finding that HHS lacked evidence for its conclusions, the district court misunderstood the record before the agency. *See* JA141. The district court concluded that because widening the de minimis range will reduce subsidies, HHS lacked "data to back up the claim and reasoning that coverage would become 'more affordable' over time." JA141.

*First*, the district court failed to consider that subsidized consumers will be able to buy less expensive plans. A decreased subsidy, therefore, does

not necessarily mean that the consumer will be worse off. The ACA's premium tax credit system is designed to ensure that certain consumers can obtain insurance and pay no more than a fixed portion of their income (between 0% and 8.5%) for a benchmark plan. For example, consider an individual who is entitled to pay no more than $3,000 per year in premiums. If this year he purchased the benchmark silver plan in his Exchange for $6,000, he would be entitled to a $3,000 tax credit and would effectively pay $3,000. And if, under the new actuarial-value policy, his issuer charges only $5,000 in premiums for the same plan, he will get only a $2,000 tax credit but will still effectively pay $3,000. Consumers who choose to purchase more expensive plans may be slightly worse off in the short run, but they too will benefit in the long-term from a healthier, broader risk pool. Contrary to the assumption undergirding the district court's conclusion, it does not inexorably follow that when subsidies decrease, plans become less affordable.

*Second*, the district court erred by assuming that all consumers benefit from subsidies to purchase their plans. After a temporarily expanded subsidy expired at the end of 2025, only some consumers are eligible for tax credits. *See* 26 U.S.C. § 36B(b)(3)(A)(i), (iii). Unsubsidized consumers will have plans available to them with lower premiums. After all, the reason that subsidies

34

will decline is that the premiums will decrease for the second-cheapest silver plans. HHS did not face a choice between offering higher or lower subsidies in a vacuum, as the district court believed. *See* JA140. (suggesting change was based on "a new Administration's policy preference for less generous subsidies" (quotation marks omitted)). Rather, HHS had to decide as a matter of policy whether higher subsidies were worth a smaller risk pool and higher premiums for everyone. HHS recognized this tradeoff and explained that it was choosing the long-term health of the risk pools over a short-term increase in subsidies for a portion of the population. 90 Fed. Reg. at 27,076. The district court was not free to second guess that policy judgment.

### B. HHS lawfully required enrollees to comply with the Reconciliation Requirement to maintain eligibility for advance premium tax credits

1. A basic principle animates the failure-to-file-and-reconcile policy: when means-tested subsidies are provided in advance based on projected income, there must be some way to reconcile the estimated subsidy paid with the amount a beneficiary is actually entitled to receive. Congress recognized this need by authorizing the Reconciliation Requirement—that is, by requiring those who obtain advance premium tax credits to file a federal income tax return and "reconcile" the advanced premium tax credits they

received with the tax credit they ultimately qualify for. *See* 26 U.S.C.

§ 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). The failure-to-file-and-reconcile

policy applies to those who do not meet the Reconciliation Requirement.

In establishing the failure-to-file-and-reconcile policy—both in its one-

year form in 2015-24 and 2026-27 and in its two-year form in 2024-25—HHS

relied on its general rulemaking authority under 42 U.S.C. § 18041(a)(1).[5]

77 Fed. Reg. at 18,444; 88 Fed. Reg. at 25,917; 90 Fed. Reg. at 27,117. As

relevant here, the provision authorizes HHS to "issue regulations setting

standards for meeting the requirements under [Title I of the ACA] *** with

respect to" four categories including "the establishment and operation of

Exchanges" and "such other requirements as the Secretary determines

appropriate." 42 U.S.C. § 18041(a)(1). Thus, to fit within this section a

regulation must meet three criteria: (1) the regulation must point to a

---

[5] Although HHS did not expressly cite other sources of statutory authority in responding to comments about the failure-to-file-and-reconcile policy, *see* 90 Fed. Reg. at 27,117, HHS also has statutory authority to "establish a program" to determine eligibility for Exchange participation, premium tax credits, and other benefits *See* 42 U.S.C. §§ 18081-18082. As HHS has explained, the Reconciliation Requirement is integral the agency's program for making those eligibility determinations. *See* 90 Fed. Reg. at 12,957; *see also id.* at 12,961 (discussing 42 U.S.C. § 18082(b)(2)(B) as additional basis for the failure-to-file-and-reconcile policy). Thus, these other sources of statutory authority underscore HHS's authority to implement the failure-to-file-and-reconcile policy.

requirement under Title I of the ACA, (2) the requirement must have a nexus to one of the enumerated categories such as operating an Exchange, and (3) the regulation must set a standard for meeting the requirement. HHS has relied on this express conferral of rulemaking authority to implement numerous provisions of the ACA, like establishing federal Exchanges. *See* 77 Fed. Reg. at 18,312. It is a load-bearing pillar for the entire edifice of the ACA. HHS appropriately relied on that broad authority to issue the failure-to-file-and-reconcile policy. First, the Reconciliation Requirement is a requirement under Title I the ACA, which requires recipients of advance premium tax credits to reconcile the credits they receive. 26 U.S.C. § 36B(f)(1); *see* 26 C.F.R. § 1.36B-4(a)(1)(i). Second, the Reconciliation Requirement is a requirement "with respect to" "the establishment and operation of Exchanges," because the requirements pertain to the advance payment of a premium tax credit for taxpayers who enroll in insurance plans through Exchanges. 42 U.S.C. § 18041(a)(1). Third, HHS "set[ ] standards for meeting [that] requirement[ ]." 42 U.S.C. § 18041(a)(1). It did so here by facilitating compliance with the Reconciliation Requirement, resting on the basic insight that a taxpayer who has failed to comply with those requirements in the past has not satisfied the "standard[ ]

37

for meeting" those requirements in the future. HHS thus had statutory authority to condition eligibility for advance premium tax credits on meeting the Reconciliation Requirement.

HHS's longstanding understanding of its authority under § 18041(a)(1) to tie the Reconciliation Requirement to eligibility to advance premium tax credits bolsters its statutory argument. When an expert agency has interpreted a statute consistently over many years, its interpretation "constitute[s] a body of experience and informed judgment to which courts and litigants [may] properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140); *see also id.* at 402 (reaffirming *Skidmore*).

2. The district court erred in concluding that HHS violated "separate, express provisions" of the ACA in issuing the failure-to-file-and-reconcile policy. *See* JA153. The district court stated that advance premium tax credits "are prescribed by statutory formula," and then concluded that conditioning eligibility for advance premium tax credits on meeting the Reconciliation Requirement "reads an exception into the statutory formula that is simply not there." JA153 (citing 26 U.S.C. § 36B(b)(2)-(3)). Neither the premise nor the conclusion is valid.

38

Congress, of course, "prescribed" the terms of advance premium tax credits in the ACA. It determined the amount of the credit, restricted the credit to taxpayers with certain annual household incomes, and it prohibited "individuals not lawfully present" from obtaining any tax credits at all. 26 U.S.C. § 36B(b)(2)-(3), (d), (e). But nothing in the structure of these interlocking statutory provisions suggests that Congress exhaustively established eligibility criteria for advance premium tax credits. Congress certainly did not think that it was defining every aspect of advance premium tax credits, for it broadly delegated authority to HHS to "establish a program" for determining eligibility for tax credits. 42 U.S.C. § 18081(a)(2); *see also* 26 U.S.C. § 36B(h) (also authorizing Secretary of the Treasury to prescribe regulations to effectuate tax credits). Rather than cabining the agency's authority, this type of broad delegation of "discretionary authority" to "prescribe rules to 'fill up the details' of a statutory scheme" affords the agency enormous latitude to act within the bounds of the statute. *Loper Bright*, 603 U.S. at 394-95.

Nor did Congress expressly prohibit HHS from tying advance premium tax credit eligibility to meeting the Reconciliation Requirement. The district court refers to "express provisions of the statute" forbidding the

39

failure-to-file-and-reconcile policy, JA153, but no such provision exists. That omission is notable, because courts expect that "if Congress had intended to curtail in a particular area … broad rulemaking authority [it] granted," then it would "do so in language expressly describing an exception." *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991).

The district court's analysis would fare no better if it rested on an implicit prohibition. The district court appeared to believe that some sort of negative implication applies because Congress established by statute the most basic criteria for eligibility. *See* JA153-154. But that cannon of interpretation "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (cleaned up). Such circumstances do not exist here because the criteria specified "can[not] reasonably be thought to occupy the field." *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 361 (4th Cir. 2020) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012)). Congress did not supply a detailed list of criteria in which failure-to-reconcile would naturally be expected to appear. Instead, it set out the basic terms of

40

advance premium tax credits and the Reconciliation Requirement and left
the details to the agency to implement.

### C.   Plaintiffs failed to show that the equitable factors weigh in favor of staying these two provisions of the Final Rule.

For the same reasons plaintiffs have not shown Article III injuries, *see
supra* pp. 21-28, plaintiffs failed to show irreparable harm to justify
preliminary relief. Their speculation about the harms that may befall them
does not suffice. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283-84
(4th Cir. 2002) (irreparable harm must be "neither remote nor speculative,
but actual and imminent" (cleaned up)).

By contrast, the harms to the government from the district court's stay
order are concrete and ongoing. HHS promulgated the actuarial-value and
failure-to-reconcile policies to address real problems in the insurance
markets. The actuarial-value policy was designed to promote market
competition, offer insurers more flexibility to serve consumers, and
"maintain robust issuer participation" in the Exchanges. 90 Fed. Reg. at
27,176. And the failure-to-file-and-reconcile policy was designed to address
both improper enrollments and potentially significant tax liabilities for some

enrollees. 90 Fed. Reg. at 12,959. The government and the public have a
critical interest in meeting those goals.

As both the Supreme Court and this Court have recognized, the
"inability to enforce its duly enacted plans clearly inflicts irreparable harm
on the [government]." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also*
*American Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638, at *3
(4th Cir. Apr. 7, 2025) (Agee, J., concurring) (granting stay and holding
irreparable harm shown because "the government suffers an irreparable
harm when it cannot carry out the orders of its elected representatives").
Because plaintiffs failed to establish countervailing harm of a similar
magnitude, the district court erred in granting them a § 705 stay.

## CONCLUSION

For the foregoing reasons, paragraphs 2(c) and 2(f) of the stay order entered by the district court should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

KELLY O. HAYES
*United States Attorney*

MICHAEL B. STUART
*General Counsel*

ELIZABETH C. KELLEY
*Deputy General Counsel*

CHARLES W. SCARBOROUGH

JOCELYN S. BEER
*Acting Deputy Associate
General Counsel for Litigation*

/s/ *Maxwell A. Baldi*

MAXWELL A. BALDI
*Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-0211
maxwell.baldi@usdoj.gov*

JILL BRADLEY
GARRETT F. MANNCHEN
*Attorneys*

*U.S. Department of Health and
Human Services*

FEBRUARY 2026

43

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,603 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
MAXWELL A. BALDI

**ADDENDUM**

# TABLE OF CONTENTS

26 U.S.C. § 36B..............................................................................A1

42 U.S.C. § 18022 ........................................................................A4

42 U.S.C. § 18041 ........................................................................A6

**26 U.S.C. § 36B**

**§ 26B. Refundable credit for coverage under a qualified health plan.**

**(a) In general.** In the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year.

**(b) Premium assistance credit amount** For purposes of this section—

**(1) In general.** The term "premium assistance credit amount" means, with respect to any taxable year, the sum of the premium assistance amounts determined under paragraph (2) with respect to all coverage months of the taxpayer occurring during the taxable year.

**(2) Premium assistance amount.** The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—

**(A)** the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 1311 1 of the Patient Protection and Affordable Care Act, or

**(B)** the excess (if any) of—

**(i)** the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over

**(ii)** an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

\*\*\*

**(f) Reconciliation of credit and advance credit.**

**(1) In general.** The amount of the credit allowed under this section for any taxable year shall be reduced (but not below zero) by the amount of any advance payment of such credit under section 1412 of the Patient Protection and Affordable Care Act.

**(2) Excess advance payments.**

A1

**(A) In general.** If the advance payments to a taxpayer under section 1412 of the Patient Protection and Affordable Care Act for a taxable year exceed the credit allowed by this section (determined without regard to paragraph (1)), the tax imposed by this chapter for the taxable year shall be increased by the amount of such excess.

\*\*\*

**(3) Information requirement.** Each Exchange (or any person carrying out 1 or more responsibilities of an Exchange under section 1311(f)(3) or 1321(c) of the Patient Protection and Affordable Care Act) shall provide the following information to the Secretary and to the taxpayer with respect to any health plan provided through the Exchange:

**(A)** The level of coverage described in section 1302(d) of the Patient Protection and Affordable Care Act and the period such coverage was in effect.

**(B)** The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of such Act.

**(C)** The aggregate amount of any advance payment of such credit or reductions under section 1412 of such Act.

**(D)** The name, address, and TIN of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.

**(E)** Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.

**(F)** Information necessary to determine whether a taxpayer has received excess advance payments.

\*\*\*

**(h) Regulations.** The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this section, including regulations which provide for—

**(1)** the coordination of the credit allowed under this section with the program for advance payment of the credit under section 1412 of the Patient Protection and Affordable Care Act, and

**(2)** the application of subsection (f) where the filing status of the taxpayer for a taxable year is different from such status used for determining the advance payment of the credit.

**42 U.S.C. § 18022**

**§ 18022. Essential health benefits requirements.**

\*\*\*

**(d) Levels of coverage**

    **(1) Levels of coverage defined.** The levels of coverage described in this subsection are as follows:

        **(A) Bronze level.** A plan in the bronze level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 60 percent of the full actuarial value of the benefits provided under the plan.

        **(B) Silver level.** A plan in the silver level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 70 percent of the full actuarial value of the benefits provided under the plan.

        **(C) Gold level.** A plan in the gold level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 80 percent of the full actuarial value of the benefits provided under the plan.

        **(D) Platinum level.** A plan in the platinum level shall provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 90 percent of the full actuarial value of the benefits provided under the plan.

    **(2) Actuarial value.**

        **(A) In general.** Under regulations issued by the Secretary, the level of coverage of a plan shall be determined on the basis that the essential health benefits described in subsection (b) shall be provided to a standard population (and without regard to the population the plan may actually provide benefits to).

        **(B) Employer contributions.** The Secretary shall issue regulations under which employer contributions to a health savings account (within the meaning of section 223 of title 26) may be taken into account in determining the level of coverage for a plan of the employer.

A4

**(C) Application**. In determining under this title,1 the Public Health Service Act [42 U.S.C. 201 et seq.], or title 26 the percentage of the total allowed costs of benefits provided under a group health plan or health insurance coverage that are provided by such plan or coverage, the rules contained in the regulations under this paragraph shall apply.

**(3) Allowable variance**. The Secretary shall develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates.

\*\*\*

**42 U.S.C. § 18041**

**§ 18041. State flexibility in operation and enforcement of Exchanges and related requirements**

**(a) Establishment of standards.**

**(1) In general.** The Secretary shall, as soon as practicable after March 23, 2010, issue regulations setting standards for meeting the requirements under this title,[*] and the amendments made by this title, with respect to—

**(A)** the establishment and operation of Exchanges (including SHOP Exchanges);

**(B)** the offering of qualified health plans through such Exchanges;

**(C)** the establishment of the reinsurance and risk adjustment programs under part E; and

**(D)** such other requirements as the Secretary determines appropriate.

The preceding sentence shall not apply to standards for requirements under subtitles A and C (and the amendments made by such subtitles) for which the Secretary issues regulations under the Public Health Service Act [42 U.S.C. 201 et seq.].

\*\*\*

---

[*] This title, referred to in subsecs. (a)(1) and (d), is title I of Pub. L. 111-148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code.